**Christopher M. PENNINGTON,**
**Appellant,**

v.

**Heather M. MARCUM (f/k/a**
**Miles), Appellee.**

No. 2006–SC–000642–DG.

Supreme Court of Kentucky.

Oct. 23, 2008.

As Modified Oct. 24, 2008.

Rhonda M. Copley Ashland, KY, Counsel for Appellant.

Martha Alice Rosenberg, Lexington, KY, Counsel for Appellee.

Opinion of the Court by Justice NOBLE.

The Appellant, Christopher M. Pennington, appeals the order from the Boyd Circuit Court dated October 31, 2005. The Appellant argues that the trial court abused its discretion by setting forth findings of fact contrary to the recommendation of the domestic relations commissioner without conducting an evidentiary hearing or considering the testimony presented. Additionally, the Appellant argues that the Boyd Circuit Court erred when it overruled a motion to modify custody pursuant to the best interests of the child and submits that relocation with a minor child is sufficient to trigger a modification hearing pursuant to KRS 403.340. After reviewing the record, the applicable statutes, and relevant case law, this Court finds no abuse of discretion by the trial

court, there being substantial evidence to support the trial court's findings in favor of the Appellee, Heather M. Marcum. The Court of Appeals is affirmed for the reasons stated herein.

## I. Background

On May 17, 1999, Mikayla L. Pennington was born to the Appellant, Christopher M. Pennington, and the Appellee, Heather M. Miles. The couple was never married but resided together for approximately one year after the birth of Mikayla. By Agreed Order entered February 7, 2001, which was the final custody decree, the parties received joint custody of Mikayla with the Appellee designated as having "joint physical custody (residential parent)" and the Appellant receiving "liberal visitation" of at least two days per week.

In 2002, the Appellee married Jeremy Marcum and moved to West Virginia. The Appellant remained in Boyd County where he married and was employed at Kings Daughters Medical Center though he continued to spend his agreed-upon time with Mikayla. Various motions were filed concerning visitation and support from time to time. However, it was not until after the Appellee and her husband subsequently relocated to Appomattox, Virginia (approximately six hours from the Appellant's home), that the Appellant filed a motion asking the court to "award custody of the minor child" to him, on or about July 28, 2004, more than two years after entry of the custody decree. However, in his supporting affidavit he asked that he be granted "primary custody" or in the alternative, that the court "modify visitation" to give him extended contact "of at least every weekend." No modification motion had been filed when Appellee initially moved to West Virginia.

On referral from Boyd Circuit Court, the domestic relations commissioner held an evidentiary hearing and recommended that the parties continue to have joint custody, but changed "primary physical custody" to Appellant, with Appellee to have "secondary physical custody with liberal visitation." The commissioner emphasized that the Appellant was actively involved in his daughter's life, he and his wife arranged their work schedules so that one adult would be at home with Mikayla and the couple's other children at all times, that the Appellee provided no advance notice to the Appellant of her move to Appomattox, Virginia, and that the Appellee generally did not consult with the Appellant when making decisions regarding Mikayla.

The Appellee filed exceptions to the report and the circuit judge conducted a hearing on August 22, 2005. On October 31, 2005, the court sustained the Appellee's exception to the award of primary physical custody to the Appellant. The Boyd Circuit Court specifically noted in its October 31, 2005 Order that it was "not inclined to end a 6–year relationship with a parent merely because the parent remarries and moves to a different location." Additionally, the Boyd Circuit Court found Mikayla to be well-adjusted in her new environment, including school, and involved with several extracurricular activities. Most importantly, the court ruled "that it would be in the best interest of the minor child for the parties to continue to have joint custody, but for the Respondent [mother] to have primary physical custody and the Petitioner [father] to have secondary custody with liberal visitation as the parties have been exercising."

This appeal followed. The Court of Appeals found there was substantial evidence to support the Boyd Circuit Court's finding in favor of the Appellee and affirmed the custody order. We now affirm, but for the reasons stated herein. Further, be-

cause questions regarding relocation and its effect on custody continue to be problematic, the Court will address the nature of child custody, the effects of relocations, and when and how motions relating to relocation after a custody award should be brought, in an effort to establish clear precedent.

## II. Analysis

### A. General Discussion

■ At the heart of all relationships between parents and children is the legal concept of custody. Custody of children is traditionally described as the care, control and maintenance of the children, *Black's Law Dictionary* 725 (8th ed.2004), with natural parents having the superior right to custody above all others, if they are fit for the charge and have not given up the right. *Welsh v. Young*, 240 S.W.2d 584, 586 (Ky.1951). Historically, the *guardian by nature* of the child was the father, and on his death, the mother. For children born out-of-wedlock, the guardian was the mother. *Black's Law Dictionary* 725 (8th ed.2004). Today, both parents are recognized as having the right to custody, KRS 403.270; putative fathers may seek and obtain custody, KRS 405.051; and de facto custodians have the same right to seek custody as the father and mother, KRS 403.270. While there are a larger number of children born out-of-wedlock today than ever before, the majority of children are still born to a married couple, consisting of a mother and a father, with custody questions arising in relation to a divorce.[1]

As a consequence of the fault-based divorce scheme, sole custody was the rule for most of the 20th century. As a marital couple, both parents enjoyed full parenting rights and responsibilities; however, the dissolution of the marital bond not only altered the relationship of the parties but also altered the relationship between the parties and any children they might share. The "innocent" spouse who obtained divorce on appropriate grounds (adultery, insanity, indignities, imprisonment, bigamy, cruel treatment, or desertion) was generally deemed the fit parent. The sole custodian possessed full control and singular decision-making responsibility for his or her children to the exclusion of the other parent who received a limited period of access to the children through visitation, a term which denoted the right to see the children, but not to control them legally. During this time, custodial preference under the law evolved from father first, then to the mother first under the tender years presumption, and finally to equal consideration of both parents seeking sole custody. *See generally* Mary Kate Kearney, *The New Paradigm in Custody Law: Looking at the Parents with a Loving Eye*, 28 Ariz. State L.J. 543, 546–50 (1996).

In 1972, the Kentucky General Assembly enacted KRS 403.110 et seq. following a national trend to permit no-fault divorces. With the passage of the no-fault divorce statutes, the Commonwealth's role changed from restricting access to divorce to permitting either spouse to unilaterally sever the marital bond. Still, the goal of the Commonwealth remained unchanged—to preserve family relationships. An explicitly stated purpose of the chapter is to promote the integrity of marriage and safeguard family relationships. KRS 403.110(1). At its inception, the no-fault

---

1. *See* National Center for Health Statistics, U.S. Dep't of Health & Human Services, Pub'n No.2008–1120, *Births: Final Data for 2005,* National Vital Statistics Reports at 2 (Dec. 5.2007), *available at* http://www. cdc. gov/nchs/data/nvsr/nvsr56/nvsr56_06.pdf (noting that while the number of births to nonmarried women was increasing, they accounted only for approximately one third of all U.S. births).

divorce scheme showcased the state's emerging role as maintaining the indissolubility of parenthood after the dissolution of the marital relationship by permitting joint custody of the couple's children.

During the 1970s and 1980s, American society was making rapid changes. Women of child-bearing and -rearing age were increasingly joining the civilian labor force, so that by 1980, over half of that group were working outside the home.[2] In part because the "stay-at-home Mom" was an increasingly less conventional parenting role, fathers began taking more active roles in the day-to-day lives of their children. Consequently, at the dissolution of the marriage both parties began seeking a custody arrangement that allowed them to pursue livelihoods to maintain households and provide for their families, but also permitted them to function as available, responsible decision-makers for their children.

In 1992, the Kentucky Court of Appeals decided *Chalupa v. Chalupa*, 830 S.W.2d 391 (Ky.App.1992), which included an open endorsement of joint custody over sole custody. The Court of Appeals concluded that it was in the best interests of children for both their parents to be regularly involved in their lives. The court recognized the dynamic nature of family law and stated:

> Joint custody is also a natural progression of our no fault divorce concept, recognizing that both parties may be fit parents but not compatible to be married to each other. A divorce from a spouse is not a divorce from their children, nor should custody decisions be used as a punishment. Joint custody can benefit the children, the divorced parents, and society in general by having both parents involved in the children's upbringing.

*Id.* at 393 (citation omitted). Though the Kentucky Supreme Court declined to adopt the *Chalupa* preference for joint custody over sole custody in *Squires v. Squires*, 854 S.W.2d 765, 769 (Ky.1993), and KRS 403.270 mandates that custodial determinations are to be made individually in light of the child's best interests, joint custody has emerged as the most prevalent custodial arrangement.

 Joint custody as a legal concept has several defining characteristics. Both parents have responsibility for and authority over their children at all times. Equal time residing with each parent is not required, but a flexible division of physical custody of the children is necessary. A significant and unique aspect of full joint custody is that both parents possess the rights, privileges, and responsibilities associated with parenting and are expected to consult and participate equally in the child's upbringing.

However, since Kentucky became a no-fault divorce state and joint custody was deemed an arrangement on equal footing with sole custody, custodial arrangements have become increasingly amorphous. Though it is often stated that there are two categories of custody, sole custody and joint custody, there is in practice a subset of joint custody that combines the concept of joint custody with some of the patterns of sole custody—often called "shared custody." In shared custody, both parents have legal custody that is subject to some limitations delineated by agreement or court order. Unlike full joint custody, time sharing is not necessarily flexible and frequently mirrors a typical sole custody

---

**2.** Howard N. Fullerson Jr., Labor force participants: 75 years of change, 1950–98 and 1998–2025, Monthly Labor Review, Dec.

1999, at 3, 4, available at http://www.bls.gov/opub/mlr/1999/12/art1full.pdf.

pattern where the child may live with one parent during the week and reside with the other on alternate weekends. The weekend parent does not have "visitation," a sole-custody term which is frequently misused in this context, but rather has "time-sharing," as he or she is also a legal custodian. However, in practice, the terms visitation and timesharing are used interchangeably. Additionally, one parent may be designated the "primary residential parent," a term that is commonly used to denote that the child primarily lives in one parent's home and identifies it as his home versus "Dad's/Mom's house." This concept is frequently misnamed "primary residential custody."

A less frequently seen category found in practice is a subset of sole custody—split custody. In this arrangement, each parent has sole custody and decision-making authority while the child is in residence with him or her, and only visitation when the child is in residence with the other parent. The term "primary residential custody" may be more appropriate here, depending on how much time the child spends in residence with each parent.

Shared and split custody have developed as common-sense approaches to the realities of modern day life, even though they are not explicitly expressed in our statutes. Better technical ability to communicate, employment mobility, a given parent's ability to meet certain obligations and other such factors lead to a need for an approach to parenting after divorce that is flexible and can be customized to the needs of each family involved with the children. These broad approaches recognize that every family is unique, and that it is generally in the best interests of the child and parents to maximize contact with both parents. The "designer" approach of these concepts asks the question, "What is best for this family?" This diversity, however, makes it difficult to apply standardized provisions of the law, especially when the existing statutes do not fully address all the permutations that can occur.

### B. Modification of Custody or Visitation on Parental Relocation

■ At the outset, it should be noted that the effect of relocation by a parent with the child on custody and visitation must be viewed as either pre-or post-decree. KRS 403.340, the modification of custody statute, speaks to modification of a custody decree. By definition, a decree is a final judgment, *Black's Law Dictionary* 440 (8th ed.2004), denoted in Kentucky law as being "final or appealable." CR 54.01. Prior to entry of a decree, a court may enter temporary custody orders pursuant to KRS 403.280, and may determine time-sharing/visitation pursuant to KRS 403.320, which may be modified whenever it is in the child's best interests to do so. Any such decisions are "pendente lite," "interlocutory" or "non-final." As we have determined in a case that was argued with this one and is being rendered at the same time, *Frances v. Frances,* 266 S.W.3d 754, (Ky.2008), when the court is making its final and appealable custody decree, it must do so based on KRS 403.270, the best interests standard.

■ However, when a final custody decree has been entered, as in this case, and a relocation motion arises, any post-decree determination made by the court is a modification, either of custody or timesharing/visitation. If a change in custody is sought, KRS 403.340 governs. If it is only timesharing/visitation for which modification is sought, then KRS 403.320 either applies directly or may be construed to do so.

This pre- or post-decree designation is important when modification of custody is

sought, because of the standard the trial court must apply when a change is sought within two years of issuance of the custody decree, the serious endangerment or abandonment to a de facto custodian standard.

Prior to 1972, trial courts in Kentucky could modify custody decrees upon proof that the conditions under which the original decree was entered were changed. *See Skidmore v. Skidmore*, 261 Ky. 327, 87 S.W.2d 631, 634 (1935); *Williams v. Williams*, 290 S.W.2d 788, 789 (Ky.1956); *Hatfield v. Derossett*, 339 S.W.2d 631, 632–33 (Ky.1960); *Ward v. Ward*, 407 S.W.2d 709, 710 (Ky.1966). Though the "change

of conditions" standard still plays a role in the consideration of custody modifications, modification must now be evaluated under the terms of KRS 403.340, originally enacted in 1972, which contains a two-year limitation period on modification of custody from the date of the custody decree.[3] In 1973, this Court applied the statute when it first held that a custody decree cannot be modified within the two-year limit unless one of the two that a custody decree cannot be modified within the two-year limit unless one of the two statutory exceptions, serious endangerment or abandonment to a de facto custodian, is estab-

---

**3.** The current version of KRS 403.340 reads in relevant part:

(1) As used in this section, "custody" means sole or joint custody, whether ordered by a court or agreed to by the parties.

(2) No motion to modify a custody decree shall be made earlier than two (2) years after its date, unless the court permits it to be made on the basis of affidavits that there is reason to believe that:

(a) The child's present environment may endanger seriously his physical, mental, moral, or emotional health; or

(b) The custodian appointed under the prior decree has placed the child with a de facto custodian.

(3) If a court of this state has jurisdiction pursuant to the Uniform Child Custody Jurisdiction Act, the court shall not modify a prior custody decree unless after hearing it finds, upon the basis of facts that have arisen since the prior decree or that were unknown to the court at the time of entry of the prior decree, that a change has occurred in the circumstances of the child or his custodian, and that the modification is necessary to serve the best interests of the child. When determining if a change has occurred and whether a modification of custody is in the best interests of the child, the court shall consider the following:

(a) Whether the custodian agrees to the modification;

(b) Whether the child has been integrated into the family of the petitioner with consent of the custodian;

(c) The factors set forth in KRS 403.270(2) to determine the best interests of the child;

(d) Whether the child's present environment endangers seriously his physical, mental, moral, or emotional health;

(e) Whether the harm likely to be caused by a change of environment is outweighed by its advantages to him; and

(f) Whether the custodian has placed the child with a de facto custodian.

(4) In determining whether a child's present environment may endanger seriously his physical, mental, moral, or emotional health, the court shall consider all relevant factors, including, but not limited to:

(a) The interaction and interrelationship of the child with his parent or parents, his de facto custodian, his siblings, and any other person who may significantly affect the child's best interests;

(b) The mental and physical health of all individuals involved;

(c) Repeated or substantial failure, without good cause as specified in KRS 403.240, of either parent to observe visitation, child support, or other provisions of the decree which affect the child, except that modification of custody orders shall not be made solely on the basis of failure to comply with visitation or child support provisions, or on the basis of which parent is more likely to allow visitation or pay child support;

(d) If domestic violence and abuse, as defined in KRS 403.720, is found by the court to exist, the extent to which the domestic violence and abuse has affected the child and the child's relationship to both parents.

lished. *Day v. Day*, 490 S.W.2d 483 (Ky. 1973). This was reaffirmed in 1976 when the Court held that a trial court's sua sponte review and modification of a custody order within the two year period was in error. *Chandler v. Chandler*, 535 S.W.2d 71 (Ky. 1976). Visitation, on the other hand, can be modified upon proper showing, at any time, having no two-year restriction pursuant to KRS 403.320.[4] And, after two years from the date of the custody decree, the standard reverts to review of the best interests of the child, either under KRS 403.270 or KRS 403.30(3).

Since Kentucky accepted joint custody as a custodial arrangement equally tenable and commensurate with sole custody, and given that very individualized time-sharing arrangements have developed under shared joint custody or split sole custody, whether a custodian's relocation with the minor child changes the inherent nature of the custody the parties have or merely affects timesharing/visitation has become a frequent and pertinent question. This issue has been commonly approached in two ways. Litigants have characterized the motion as one to modify visitation pursuant to KRS 403.320 or one to modify custody pursuant to KRS 403.340.

The obvious problem is that parties often ask for one thing when they are actually seeking the other, due to the unique nature of their shared (joint) custody or split (sole) custody. Courts have struggled ever since the concept of joint custody emerged with what part physical or residential possession of the child plays in each type of custody.[5] However, a modification of custody means more than who has physical possession of the child. Custody is either sole or joint (or the subsets of each) and to modify it is to change it from one to the other. On the other hand, changing how much time a child spends with each parent does not change the legal nature of the custody ordered in the decree. This is true whether the parent has sole or joint custody: decision-making is either vested in one parent or in both, and how often the child's physical residence changes or the amount of time spent with each parent does not change this.

This is perhaps too legalistic in a reality-based world. To most people, having custody means having possession of the child. Parties have addressed this understanding by applying terms such as "primary residence" or "residential parent," in their agreements. This type of thinking is often inconsistent with the legal meaning of joint custody, wherein both parents are equal legal custodians, but is nonetheless prevalent.

---

4. The current version of KRS 403.320 reads in relevant part:

 (1) A parent not granted custody of the child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would endanger seriously the child's physical, mental, moral, or emotional health. Upon request of either party, the court shall issue orders which are specific as to the frequency, timing, duration, conditions, and method of scheduling visitation and which reflect the development age of the child.

 (2) If domestic violence and abuse, as defined in KRS 403.720, has been alleged, the court shall, after a hearing, determine the visita-

 tion arrangement, if any, which would not endanger seriously the child's or the custodial parent's physical, mental, or emotional health.

 (3) The court may modify an order granting or denying visitation rights whenever modification would serve the best interests of the child; but the court shall not restrict a parent's visitation rights unless it finds that the visitation would endanger seriously the child's physical, mental, moral, or emotional health.

5. An excellent discussion of this is set forth in *Fenwick v. Fenwick*, 114 S.W.3d 767 (Ky. 2003), and will not be elaborated upon here.

In 2003, this Court did an extensive review of custody and relocation issues in *Fenwick v. Fenwick*, 114 S.W.3d 767 (Ky. 2003), a case that arose when the mother and father, who had temporary joint custody and nearly equal timesharing, disputed whether the mother could relocate with their two daughters a distance of some thirty-five miles to Jefferson County, Kentucky. The mother filed a motion requesting the court's approval to relocate with the children. The father objected, claiming that the move was contrary to the children's best interests, and asked that if the mother did move, he be named "primary residential custodian." In a pendente lite order, the court found that it was not in the children's best interests to relocate, continued temporary joint custody, and left the mother designated "primary caregiver," with the option of relinquishing that designation if she decided to relocate. This order was later made the final custody decree on December 8, 1997.

*Fenwick* has an extensive, learned discussion on the confusion that surrounds relocation, custody and timesharing/visitation. However, much of what this Court discussed in *Fenwick* must henceforth be disregarded, because this Court applied the wrong statute. Like the *Frances* case also rendered today, the relocation in *Fenwick* was raised *prior to* entry of the final custody decree, and consequently KRS 403.270, with its best interests standard should have been applied by this Court as it was by the trial court. Instead, the *Fenwick* Court focused its relocation determination on who was the primary residential parent, which alone is not the proper basis for a modification of custody.

Rather, had the relocation motion been made post-decree, as it was in this case, the focus should have been on whether an actual change in custody was being sought. *Fenwick* directs the parent opposing relo-

cation of the children to file a motion for change of custody pursuant to KRS 403.340, yet subsequently acknowledges that "the essence of joint custody is shared decision-making," and that "the joint custody itself will remain unaffected by [the mother's] relocation because [the father] will still be able to continue sharing substantial time with his children through personal contact and other means...." 114 S.W.3d at 789. If the latter is correct, and it is, then clearly a parent opposed to relocation, but not seeking a change in joint custody, does not need to make a motion for a change of custody, but rather a motion for modification of timesharing.

In a sole custody arrangement, KRS 403.320 speaks clearly to visitation granted to a "parent not granted custody" and modification of that visitation based on the best interests of the child. Modification of the visitation schedule does not alter the sole nature of the custody. While there is no statute that specifically addresses modification of timesharing in a joint custody setting, it is reasonable to infer that modifying it does not alter the nature of joint custody. Also, since the nature of the custody does not change, the trial court is not bound by the statutory requirements that must be met for a change of custody, but can modify timesharing based on the best interests of the child as is done in modifying visitation.

Thus, the first question on a custody modification or relocation motion is, "Is the motion actually seeking modification of custody or visitation/timesharing?" In *Fenwick*, the mother's motion to relocate ended up resulting in a modification of timesharing due to relocation. To oppose it, the father, who did not want the child to relocate, was directed by this Court to ask for a modification of custody. However, this would necessitate that he ask for a change from joint custody to sole custody,

vested in him. What the father in *Fenwick* really wanted was to become the primary residential parent, which would be a modification of timesharing under joint custody. He was asking the court to consider what is in the best interests of the child as to where and to what extent the child spends time, not that he become the sole decision-maker.

However, when the party opposing relocation is truly seeking a change in custody, from joint to sole (or vice-versa), the second pertinent question regarding modification of custody is, "When was the custody decree issued?" This will determine the standard of review for modification.

 If a parent opposing relocation files a motion to modify custody within two years of the date of the custody decree, then the moving party must establish that the move or other reason seriously endangers the child or that the child has been abandoned to a de facto custodian in order to modify custody. If the standard is met, and custody is changed, then that parent as sole custodian could prevent relocation of the child. But, if the only interest of the opposing party is to object to relocating the child, but not to alter joint decision-making, then he is seeking to have the existing visitation/timesharing arrangement changed, and need only establish that it is in the child's best interests not to relocate, which would thereby change the existing visitation/timesharing situation. While this may appear to undercut the purpose of the two-year limitation in KRS 403.340 on modification of the custody decree, when only visitation/timesharing modification is sought, the specific language of KRS 403.320(3) controls, which allows modification of visitation/timesharing "whenever modification would serve the best interests of the child," and specifically directs that a court "shall not restrict a parent's visitation rights" unless allowing visitation would seriously endanger the child. As a matter of statutory construction, the more specific statute controls.

 If a motion for change of custody is made more than two years after the date of the custody decree, the court must then evaluate custody based on the best interests of the child, and determine whether a change of custody from joint to sole should occur on that basis. If so, relocation of the child will be prevented. If not, the question converts itself to whether the change in visitation/timesharing, either due to allowing relocation or denying it, is in the best interest of the child. Obviously, if a parent who has been the primary residential parent relocates and the child does not, the primary residential parent will change.

 Every case will present its own unique facts, and the change of custody motion or modification of visitation/timesharing must be decided in the sound discretion of the trial court. This is true whether the child lives with one parent in an arrangement like a sole custody arrangement or whether there is equal timesharing or something in between. Since "serious endangerment" or "best interests" is not defined, it is left to the sound discretion of the trial court whether the party opposing relocation has met his burden on either a modification of custody or visitation/timesharing.

 The party seeking modification of custody or visitation/timesharing is the party who has the burden of bringing the motion before the court. A residential parent who wishes only to change the visitation/timesharing due to his relocating with the child may bring the motion to modify visitation/timesharing under KRS 403.320. If that parent believes that the relocation will make a joint custody arrangement unworkable, then the motion

should be made for a change of custody from joint to sole under KRS 403.340.

■ Likewise, when one parent indicates an interest in relocating with the child, the parent opposed need not wait, but could file his own motion. A parent who has equal or nearly equal visitation/timesharing and who wants to prevent a child's relocation with the other parent, but does not want to change custody from joint to sole, could bring a motion for a change of visitation/timesharing under KRS 403.320. This could result in a designation of that parent as primary residential parent if the child is not allowed to relocate because it is not in his best interests to do so. If that same parent wants to change custody from joint to sole custody to him, he must bring the motion for a change of custody and proceed under KRS 403.340.

■ Both parents may need to bring motions if their wishes differ. For example, if the residential mother makes a motion to modify visitation/timesharing to allow her to relocate with the child, the father may need to make a motion for modification of visitation/timesharing to name him as the residential parent, which would prevent relocation of the child. Or, the father could make a motion to be named sole custodian, and if he could meet his statutory burden, there would be a change of custody which would also defeat the relocation. If neither party wishes to change the nature of the custody, and the court determines that it is in the best interest of the child to relocate with the mother, the father's visitation/timesharing would be modified to an accommodation as reasonable as possible given the distance of the relocation and the means of the parties.

To the extent that this Court's prior decision in *Fenwick* and its progeny is inconsistent with this Opinion, it is overruled.

## C. Application to this Case

■ In this case, the Appellant brought his motion for "custody of the minor child" or, in the alternative, to modify visitation to give him extended visitation/timesharing of "at least every weekend," on or about July 28, 2004, more than two years after the Order granting joint custody on February 7, 2001. If Appellant was actually seeking a change of custody from joint to sole, KRS 403.340(2) which imposes a two-year limitation, does not apply, and the court was free to look at a custody modification based on the best interests of the child. Likewise, if the Appellant was actually seeking only a modification of visitation/timesharing, the standard the court had to apply is what is in the best interests of the child. The trial court specifically stated that its findings were based on "the best interests" of Mikayla, specifically citing her relationship with her mother's new family, a new sibling she had been with for some time, her adjustment to her present home and school, the fact that Appellee was acknowledged to be a good mother, and that the parties had been able to work out visitation/timesharing for a significant period of time. The court determined that the best interest of the child required retaining the current custody status. This effectively denied Appellant's motion for a change of custody. Despite mixing terminology of sole and joint custody, and awarding an unknown status of "secondary custody" to Appellant, the trial court actually modified visitation/timesharing by allowing the relocation which inevitably altered the when and how of Appellant's time with his child, but did not alter the nature of the parents' joint custody. This effectively denied Appellant's alternative motion for "visitation" every weekend. It

is clear that the trial court had an ample factual basis for its decision and did not abuse its discretion.

It was appropriate for the Appellant to file the alternative motions, as he objected to the changes relocation would bring to his current visitation/timesharing arrangement with his child, and presumably he also wished to be named sole custodian. However, Appellee could have also brought a motion to modify the current visitation/timesharing arrangement due to the changes brought about by her new relocation with the child. Both parties have an interest, and it is appropriate for either to seek a modification of visitation/timesharing or custody. Nonetheless, the issues could be resolved on the Appellant's motion alone, and the trial court appropriately did so.

■■■ As to whether the trial court erred in relying on the hearing conducted by the domestic relations commissioner and the argument of counsel, the circuit court has complete discretion regarding the use of a commissioner's report. *Haley v. Haley*, 573 S.W.2d 354, 356 (Ky.App. 1978). Further, the trial court has the right to reevaluate the evidence and reach a differing conclusion from the commissioner. *Basham v. Wilkins*, 851 S.W.2d 491 (Ky.App.1993). In *Eiland v. Ferrell*, 937 S.W.2d 713 (Ky.1997), this Court conclusively stated that the trial court has broad discretion in actions relying on commissioner's reports, constrained only by the pertinent Rules of Civil Procedure.

■■■ Additionally, pursuant to CR 53.06(2), "[t]he court after hearing may adopt the report, may modify it, or may reject it in whole or in part, or may receive further evidence, or may recommit it with instructions." The trial commissioner acts only to further judicial economy by assisting the trial court; the commissioner's report is a recommendation and is not binding. It is the trial court itself that makes findings of fact, either by adopting those recommended by the commissioner or by acting anew. When actions are tried upon facts without a jury, the trial court's findings will not be set aside unless they are clearly erroneous and, therefore, require the support of sufficient evidence. CR 52.01.

■■■ The Appellant asserts that the findings of the trial court included in the October 31, 2005 order are in direct contradiction to the commissioner's findings. That is clearly within the trial court's discretion. The distinctions between the findings of the commissioner and the Boyd Circuit Court are more appropriately characterized as varying constructions of the same testimony. The commissioner and the Boyd Circuit Court came to similar, yet dissimilarly worded factual findings agreeing that Mikayla was born to the parties out-of-wedlock, the Appellant was an active participant in Mikayla's life but she primarily resided with the Appellee, and that Mikayla was well-adjusted in her new home in Appomattox, Virginia. It is the court's legal conclusions that are dramatically different from those of the commissioner, which is certainly within the court's authority. As to the claim that the court was required to conduct a second evidentiary hearing, it is clear that it was not required to do so. The Boyd Circuit Court appropriately reviewed the report of the Domestic Relations Commissioner, allowed arguments by counsel and gave thoughtful consideration to both. There is no clear factual error and no abuse of discretion.

### III. Conclusion

The trial court did not make clearly erroneous findings of fact, nor did it abuse its sound discretion in relying on the Do-

mestic Relations Commissioner's report and the arguments of counsel. Further, the trial court correctly determined the best interests of the child on the alternative modification motion made more than two years after the date of the custody order. The Court of Appeals is affirmed.

ABRAMSON, SCHRODER and SCOTT, JJ., concur.

CUNNINGHAM, J., dissents by separate opinion in which VENTERS, J., joins.

VENTERS, J., dissents by separate opinion.

MINTON, C.J., not sitting.

Dissenting Opinion by Justice CUNNINGHAM.

I respectfully dissent from the result of the majority while at the same time applaud much of what Justice Noble says in her opinion. Her narrative history is much needed in bringing to light a growing concern in child custody and visitation issues in our ever increasingly mobile society. I also agree with her analysis of the proper standard of proof in these kinds of cases.

However, I part ways with the majority because of the lack of analysis given by the trial court to the issue of relocating a child who has long had a close relationship with both her mother and her father. This deficiency is in large part caused by our own failure to provide guidance to trial judges in addressing this daunting problem. Therefore, I would vacate and re-

mand for further proceedings consistent with this dissenting opinion.

We can no longer afford the simplistic approach to arbitrarily allow parents to relocate to distant places simply because the child is doing fine in the primary physical custody of that parent. There is a tremendous amount of evidence which connects frequent residential moves of children of separated parents to major problems in child adjustment. The effects upon children being frequently relocated include lower academic performance and higher rates of problems with depression, conduct, and peer relationships.[1] We are not talking about moves by intact families where children usually cope and sometimes even thrive. Relocation by a divorced parent where the child is torn away from the mother or father is uniquely different.

In 1998, the prestigious American Academy of Matrimonial Lawyers took on the difficult problem of parental relocation and proposed a Model Relocation Act. The Act itself lists several factors that the trial court should consider before allowing the relocation of a child.[2] While many states have dealt with the relocation issue through legislation, others have given—as we should do here—guideposts to trial courts through their highest courts.[3]

Of course, each jurisdiction is unique, but there are common factors running through all. The following are but a few of these common factors: (1) the age of the child; (2) the purpose of the move; (3)

1. See "Social Science and Children's Best Interests in Relocation Cases: *Burgess* Revisited," by Richard A. Warshak, Ph.D., 34 Fam. L.Q. 96 (2000–2001)

2. See "Inertia and Inequality: Reconceptualizing Disputes Over Parental Relocation," by Merle H. Weiner, 40 U.C. Davis L.Rev. 1776 (2006–2007).

3. *Mize v. Mize*, 621 So.2d 417 (Fla.1993); *In re Marriage of Francis*, 919 P.2d 776 (Colo. 1996); *Pollock v. Pollock*, 181 Ariz. 275, 889 P.2d 633 (Ariz.App. Div. 1, 1995); *In re Marriage of Eaton*, 269 Ill.App.3d 507, 207 Ill. Dec. 69, 646 N.E.2d 635 (1995).

the distance of the move; (4) the worthiness of the move for the child when balanced with any negative effects; (5) the improvement of the child's standard of living; (6) the physical hardship of travel for the child on visitation with the non-custodial parent; (7) the presence or absence of extended family for the child at the new location versus the existing location; (8) the motivation of the noncustodial parent for objecting to the move (i.e., is it genuine concern for the child or simply a way of punishing the former spouse?); (9) whether the non-custodial parent has turned down career advancement opportunities by not moving away in order to stay close to the child; (10) the possibility and plausibility of the non-custodial parent following the child; and (11) the number of times the custodial parent has moved.[4]

I search in vain to find attention given by the trial court to any of these key elements in its custody determination.

It is significant that this is a "joint custody" case and Justice Noble ably describes how that arrangement places more responsibility for child rearing on both parents than in a "sole custody" situation. Here, the non-custodial parent is legally entitled to be involved in all aspects of the child's life, which is independent of the time actually spent in the child's presence. The letter and spirit of *Chalupa*, a landmark case referred to by the majority, hovers over these relocation cases. Indeed, "a divorce from a spouse is not a divorce from their children," especially in joint custody cases.[5] However, when the custodial parent moves far away with a child, an effectual "divorce" occurs between the child and the non-custodial parent.

The trial court in this case gave no treatment whatsoever to the contributing role of the father in making this child happy and a good student. There was no consideration of what would happen when this dual parenthood was cut asunder. The trial judge stated: "The court is not inclined to end a six year relationship of a child with a parent merely because that parent remarries and moves to a different location." The essence of the trial court's findings dealt only with uncontroverted issues; the parties never contested that both were good parents, or that the child had been with the mother for a very long time and was doing well. The trial court dealt solely with the relocation and its effects on the child. Yet the findings totally ignore the issue of the case.

The importance of having both parents engaged in the upbringing of children cannot be overemphasized. Reams of research material are available addressing the negative impact parental relocation has upon children.[6] If we are truly dedicated to placing the child's best interest as paramount, then we must seriously rethink our current notions of adult freedoms and prerogatives. When a custodial parent decides to move a great distance, the non-custodial parent may no longer be deeply involved in the child's life. The custodial parent has a choice—the choice not to move. The non custodial parent has no

---

4. Here, the custodial parent, Heather, has moved five times since she moved from Ashland, Kentucky to Charleston, West Virginia in February of 2002, and apparently eight times since the entry of the Agreed Order in 2001.

5. *See Chalupa v. Chalupa*, 830 S.W.2d 391, 393 (Ky.App.1992).

6. For a rundown on the statutory or case law treatment of parental relocation divorce cases, see an article entitled, *Relocation of the Custodial Parent: A State–By–State Survey*, by David M. Cotter, Assistant Editor, Divorce Litigation, Volume 18, Number 6, June 2006.

choice and is not only helpless, but essentially stripped of his or her child. The child is also at the mercy of the custodial parent's choice.

The majority refers to another relocation case that this Court decides today, which works in tandem with this one. *Frances v. Frances*, 266 S.W.3d 754 (Ky. 2008). Not only are these two cases distinguishable, but the distinction between them is instructive. First of all, in *Frances* this Court affirms the Court of Appeals' decision which relied heavily upon *Brumleve v. Brumleve*, 416 S.W.2d 345 (Ky.1967). That case provides the underpinning for this dissent: "[Custodial parents] should be given considerable latitude in choosing where they will live. But when this right is challenged by the former [spouse and parent] of the children, [the custodial parent] should offer some plausible reason for taking minor children out of the jurisdiction of the court to the prejudice of the visitation rights of the [non-custodial parent]. Mere whim is not enough." *Id.* at 346. In *Frances*, the trial court considered the issue of relocation as critical to its decision-making. The majority declared: "Though the trial court stated the relocation of the Appellant was a substantial factor in the custodial determination ... the record also indicates that the trial court placed significant weight on Haley's strong relationship with her father, frequent interaction with the father's extended family, and adjustment within the community." *Id.* at 758.

In my writing here, I do not opine that the trial court necessarily got it wrong in this case. However, I think there was insufficient consideration of the core issue—*the impact of the relocation upon the child.* Or at best, there were insufficient findings and lack of a much needed analysis.

I am concerned that our Court passes up a golden opportunity today to lend much needed guidance to our trial judges, who continue to confront the problem before us without assistance from this Court or the legislature.

Therefore, I very respectfully dissent.

VENTERS, J., joins.

Dissenting Opinion by Justice VENTERS.

I join Justice Cunningham's dissent in this case simply because I agree with his point, and the Appellant's argument, that the trial court took the unilateral relocation of the child as a *fait accompli* without adequate consideration of impact of the relocation on the child and on the child's other family relationships. Doing so, I believe, encourages such unannounced relocations when we should adopt, or at least promote, a policy that requires the joint-custodians to discuss the relocation before it occurs. The Appellee's pre-emptive move to Virginia was the ultimate usurpation of the status of "sole custodian" despite the joint custody decree then in effect. Except in the case of very young infants, a pre-emptive move can only rarely be accomplished without involving the child in the secrecy, to the detriment of its relationship with the non-residential parent.

Otherwise, I agree fully with Justice Noble's analysis in the majority opinion, and note that I concurred with the majority in the companion case of *Frances v. Frances*, 266 S.W.3d 754 (Ky.2008).

I distinguish this case from *Frances* because, in *Frances*, no child custody determination had been made by any court prior to the child's relocation.