**Rebecca Josephine BURTON,
Appellant,**

v.

**Nicholas Martin BURTON, Appellee.**

**No. 2011–CA–000573–ME.**

Court of Appeals of Kentucky.

Nov. 23, 2011.

Rebecca J. Johnson, Marion, KY, for appellant.

Jill L. Giordano, Princeton, KY, for appellee.

Before TAYLOR, Chief Judge; LAMBERT and THOMPSON, Judges.

## OPINION

LAMBERT, Judge:

Rebecca Burton appeals from the Lyon Circuit Court's February 23, 2011, order modifying parenting time in favor of Nicholas Burton. After careful review of the record and the merits, we affirm the trial court's findings of fact and conclusions of law.

Rebecca and Nicholas Burton were married on May 25, 2002, and are the parents of Liam Burton and Megan Burton, born December 15, 1999, and April 16, 2004, respectively. The parties were divorced on July 17, 2006, and the divorce decree incorporated a settlement agreement whereby the parties agreed to joint custody with Rebecca as the primary physical custodian.

In the year that the divorce was finalized, Rebecca received her degree in political science from Murray State University, and she was attending the American Justice School of Law in Paducah, Kentucky until it closed two years later. Rebecca then began her studies at West Kentucky Technical College in Paducah, and she was expecting to receive her associate's degree in nursing science in May 2011. Rebecca has also worked for several years at the Dress Barn in Eddyville, Kentucky, which provides health insurance for her and the children.

Several months after the divorce, Rebecca moved in with her boyfriend, James Frost. Rebecca and James have resided together in the same residence in Fredonia, Kentucky since March 2007. Nicholas never voiced an objection to Rebecca living with James, and in fact, he was aware that James was acting as a step-parent to his two children. Liam and Megan have continued to live at this residence since 2007 and have consistently attended Lyon County Schools.

The record indicates that immediately after the divorce, Nicholas had somewhat limited involvement with the children, and in fact in 2008, Rebecca filed a "request for re-evaluation of custody," asking the court to require Nicholas to spend more time with the children and assist with childcare while she was in school or at work. The parties resolved this in mediation, as designated in an order dated May 6, 2008, which required Nicholas to provide day care to the children four days a week.

Rebecca has allowed Nicholas frequent visitation, and the children spend every Thursday with their paternal great-grandmother, who provides child care in lieu of Nicholas providing child care costs on that day. Even though Rebecca was pursuing her degrees and working part time to provide health insurance and financial support to the children, she contends that she was a devoted mother. She would finish school at 2:30 or 3:00 and would be available to pick up the children around 5:30 p.m. each day after work. It is undisputed that she spent evenings with her children at home until they went to bed each night.

This appeal arose when Nicholas filed his "verified motion for modification of custody and for ex parte relief" on December 7, 2010. In this motion, Nicholas alleged that the children should be removed from Rebecca's home because he believed the children's emotional and physical well-being were at risk. Among Nicholas' allegations, he alleged that another adult male had moved into Rebecca's home temporarily and that he had received phone calls from the children's teachers about the children being unclean and dressed inappro-

priately. He also alleged that the children did not have lunch money; that Rebecca did not show an interest in their school work; that Megan would not be able to advance in school because she was struggling with reading; and that Rebecca failed to provide proper medical, dental, and vision care for the children.

The trial court entered an ex parte order on December 7, 2010, and granted Nicholas temporary sole physical custody of the children. Nicholas immediately removed the children from Rebecca's care. On December 17, 2010, the trial court entered an order setting the matter for an evidentiary hearing on March 28, 2011. However, Rebecca filed her own ex parte motion to vacate the ex parte custody order. The trial court vacated the ex parte order of sole custody on January 10, 2011, and the evidentiary hearing was held on January 31, 2011.

At that evidentiary hearing, the court heard the testimony of the parties, several teachers, James Frost, the paternal great-grandmother, and the children's step-mother.

Both Rebecca and James denied that a man by the name of Jay Harbin had moved into their residence. James testified that Mr. Harbin was a longtime friend of his who helped him from time to time in his car repair shop. Mr. Harbin may have stayed at their residence six or seven times, but he never moved into the residence and was never alone with the children. James testified that Mr. Harbin never spent the night when the children were home. James further testified that even though Mr. Harbin was convicted of drug charges fifteen years ago, there was never any allegation or evidence of any drug use by Mr. Harbin since the time of his conviction. However, the trial court found that exposing the children regularly to a convicted felon could be harmful and was not in the children's best interest.

The testimony also indicated that James has three older children who reside with their mother and visit James and Rebecca from time to time on some weekends. Rebecca testified that Liam and Megan enjoy the weekends when the older kids visit, and the kids enjoy sleeping on couches and sleeping bags to accommodate the other children. She denied that these visits have any adverse effect on the children. The trial court, however, found that the routine the children had was "obviously interrupted" by the older children visiting.

Regarding Megan's progress at school and with reading, her teacher testified at the hearing that Megan was not struggling with reading. The testimony reflected that Nicholas' decision to hire a private tutor was based on his own desire to help her with reading and was not done at the recommendation or request of any teachers. However, the record also reflected that Rebecca had not signed Megan's reading log consistently and often missed several nights in a row signing the log. The log reflects Nicholas' or his wife's signature on the nights where Megan was with them. Based on this evidence, the trial court concluded that it was "difficult to believe that [Rebecca] did read with [Megan] regularly."

The trial court also made a finding that Liam's behavior improved while he was solely in Nicholas' care. The trial court based this finding on the testimony of Liam's teacher that Liam had fewer infractions that required him to move "a paw" (the classroom uses a paw system for behavioral issues, whereby the students have to remove or move a paw if they misbehave) while he was residing with Nicholas. However, the teacher did not attribute the improvement in Liam's behavior to anything Nicholas was or was not doing with

Liam. The teacher also testified that Liam's behavior improved after the parent-teacher conference on September 27, 2010, when she discussed Liam's behavior with both parents.

The teachers also testified that both children were appropriately dressed and were clean, which contradicted Nicholas' initial allegations to the contrary. The trial court did find that on one occasion, Megan wore flip-flops to school when it was cold outside.

At the hearing, Rebecca presented evidence that she had provided health and dental care for the children and also argued that Nicholas did not take the children to the doctor or dentist during the five weeks he had custody of them, despite his alleged concerns.

Rebecca also presented evidence that Nicholas was arrested for drunk driving on January 10, 2008. The uniform citation in the record indicates that a passerby called to report that Nicholas was driving recklessly. When the officer responded, he found Nicholas and his car on the lawn of a stranger's home. Nicholas was not able to stand up and had urinated on his pants. The officer noted that he failed the field sobriety tests, but because the portable breathalyzer did not show the presence of alcohol, the officer suspected drug abuse and ordered a blood analysis.

Nicholas testified that at the time of the incident, he was on the way to pick up the children. He also admitted that he had taken Ambien, but he offered no explanation for the erratic driving. He pleaded guilty to a reduced sentence of reckless driving before the drug tests were complete, although they later showed no illegal drugs in his system. Regarding the reckless driving incident, the trial court found that it had "little probative value at the present time."

After the hearing, the trial court noted that it was considering Nicholas' motion to modify custody as a motion to modify parenting time and entered its judgment accordingly. In an order dated February 23, 2011, the trial court determined it was in the children's best interest to appoint Nicholas as the primary residential parent. Essentially, the trial court found that Nicholas was able to spend more time with the children after school because of his schedule as an Emergency Medical Technician (EMT), and that Nicholas had improved in his parenting since the divorce. The trial court noted the above findings regarding Nicholas' allegations, and also noted that Nicholas maintains a smoke-free home, whereas the children are regularly subjected to smoke in Rebecca's home. Also of primary concern to the trial court was the child care situation after school while the children were in Rebecca's care. On the days the children were not with Nicholas' grandmother, they rode the bus to James' garage and stayed there until Rebecca picked them up. The trial court found that James could not properly supervise the children and could not ensure that the children would not put themselves in unsafe places, despite his best efforts.

Rebecca now appeals the trial court's findings of fact and conclusions of law and order designating Nicholas as the primary residential parent.

As her first assignment of error on appeal, Rebecca contends that the trial court improperly treated Nicholas' motion for custody as a motion to modify parenting time. In support of this argument, Rebecca argues that the possible outcome for modification of parenting time is different than for modification of custody, however she does not articulate how she would have fared better had the trial court treated this as a motion to modify custody, as Nicholas

originally styled his motion. Instead, Rebecca points out that when considering a motion to modify custody, the trial court shall consider the factors enumerated in Kentucky Revised Statutes (KRS) 403.340. However, under a request for modification of parenting time, the trial court instead considers the best interest of the child as set forth in KRS 403.320. *See Pennington v. Marcum,* 266 S.W.3d 759 (Ky.2008).

In *Pennington,* the Kentucky Supreme Court recognized that "parties often ask for one thing when they are actually seeking the other[.]" *Id.* at 767. The *Pennington* Court recognized the confusion parties often have regarding the distinction between "custody" and "physical possession of the child." *Id.* The Court recognized that a strict interpretation of the meaning of "custody" applying only to changes in the arrangement of joint decision-making for the children "is perhaps too legalistic in a reality-based world." *Id.*

In the present case, Nicholas did not seek to alter the joint custody arrangement in regards to Liam and Megan, but simply wanted to modify his parenting time. We agree with the trial court that this was the appropriate course of action given the possible semantic interpretation of the word "custody." Furthermore, we are unsure exactly how Rebecca was prejudiced by the trial court's determination because the trial court used the appropriate standard to determine what was in the child's best interests.

We now turn to the merits of Rebecca's argument that the trial court's findings of fact and conclusions of law were against the weight of the evidence and constituted an abuse of discretion. When reviewing a decision in a child custody case, the test is whether the findings of fact of the trial court were clearly erroneous or the decision constitutes an abuse of discretion. *Eviston v. Eviston,* 507 S.W.2d 153 (Ky.1974). "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Kentucky Rules of Civil Procedure (CR) 52.01. Findings of fact are only clearly erroneous when they are manifestly against the weight of the evidence. *Wells v. Wells,* 412 S.W.2d 568, 571 (Ky.1967). Finally, we note that in reviewing a trial court's decision, the test is not whether we would have reached a different ruling, but whether the trial court's ruling was clearly erroneous, whether it applied the correct law, or whether it abused its discretion.

In the instant case, we simply cannot say that the trial court's findings of fact were clearly erroneous or that it applied incorrect law in determining the children's best interests. Regarding the argument that Mr. Harbin had been at Rebecca's home around the children on several occasions, it was not against the evidence to conclude that it was against the children's best interests to be exposed to a convicted felon. Even the slightest impropriety could be detrimental to Liam and Megan, and because the testimony indicated that Mr. Harbin had stayed with James and Rebecca, it was not clearly erroneous for the trial court to make this finding and to conclude that it was against the children's best interests.

Additionally, the trial court found that the presence of James' children on various weekends upsets the children's normal routine by ousting them out of their beds and bedrooms and forcing them to sleep on couches. While we may not have concluded this was in fact detrimental to the children or against their interests to spend time with "siblings," it was not clearly erroneous for the trial court to determine that it did in fact upset the children's

normal routine. Accordingly, we find no abuse of discretion in this regard.

The evidence also supported the trial court's finding that Rebecca's school and work schedules inhibit her ability to spend sufficient time with the children and attend to their academic and extracurricular needs. This finding was supported by the fact that the children went to James' garage after school and spent approximately two and a half hours there per day, often unsupervised. While Rebecca testified that she spent evenings with the children and helped them with homework, the evidence indicated that Rebecca often failed to sign Megan's homework logs on a regular basis. There was no reason given for this oversight in the record, and thus we do not find the trial court's finding that "it is difficult to believe that [Rebecca] did read with [Megan] regularly" to be against the weight of the evidence or to be clearly erroneous.

The trial court also found that while Rebecca has been bettering herself, Nicholas has been the primary means of transporting the children to extracurricular activities and athletic events. While we certainly do not fault Rebecca for furthering her education and seeking a nursing degree, the fact of the matter is that the evidence supported the finding that Nicholas and his wife were better able to support the children's after school activities. Thus, this finding was not clearly erroneous.

The trial court also found that Rebecca and James smoke inside their home and in their car, and apparently it makes no difference to them whether the children are present or not. Given the tremendous evidence that secondhand smoke is harmful to children (and adults), it was not clearly erroneous or an abuse of discretion for the trial court to conclude that the children

living in Nicholas' smoke-free home was in their best interests.

Rebecca argues that the trial court's findings that Nicholas' work schedule is more stable and that his life is generally more stable is against the weight of the evidence. However, the trial court found that Nicholas is remarried and expecting a baby, that each child will have its own room to sleep in, and that Nicholas has maintained consistent employment for the last eight years at Mercy Regional EMS. The trial court noted that after the divorce Nicholas was not as involved in the children's lives, but that the evidence clearly indicated that he had changed his habits and was now very involved in the children's activities, school, etc. We cannot dispute this finding, as the evidence supported that Nicholas participated in school activities, met with teachers, sought out a tutor for Megan, transported the children to and from games, and helped them with homework, as denoted by his signature on Megan's homework logs. Thus, the trial court's finding that Nicholas is a good parent is not against the weight of the evidence and is not clearly erroneous.

Finally, the trial court found that both parents love the children and neither parent has neglected them. This finding was supported by the evidence, and we will not disturb it on appeal. After making the above findings, the trial court determined that as a matter of law, it was in Megan and Liam's best interests for Nicholas to be the primary residential parent. This determination is supported by the extensive findings of fact and was not an abuse of discretion. The trial court is in the best position to judge the credibility of the evidence, and we will not substitute our judgment on appeal.

■ Rebecca also argues that the trial court failed to consider the wishes of the children in making its decision. In *Hum-*

*phrey v. Humphrey,* 326 S.W.3d 460 (Ky. App.2010), the trial court heard testimony of the witnesses but also conducted interviews with the children themselves. Rebecca argues that the trial court abused its discretion by not interviewing Megan and Liam to determine their wishes. We agree with Rebecca that the *Humphrey* Court noted that interviewing the children and determining their wishes is a valid consideration for the trial court to make, but nowhere did the Court state that it was necessary for the trial court to conduct such an interview. *Id.* at 462. Thus, in the instant case, the trial court's failure to conduct such an interview with the children does not amount to an abuse of discretion.

Rebecca also argues that the trial court failed to consider Nicholas' conviction for reckless driving. While we agree that this presented some evidence that Nicholas was at one time not the suitable parent, nothing in the record or testimony indicated that Nicholas still takes Ambien or that he has had any further issues with reckless driving. In fact, Nicholas stated that he no longer uses Ambien. And, the trial court specifically addressed this in its findings of fact and conclusions of law. Therefore, Rebecca's argument that the trial court simply did not consider the evidence is without merit.

Rebecca's last argument is that the trial court abused its discretion by "flipping" the parenting time from her to Nicholas and failing to consider a parenting schedule based upon the specific circumstances of the parties. Rebecca argues that by virtue of his work schedule, Nicholas works twenty-four hours straight out of every seventy-two hours, and during this time Nicholas is out of contact with the children. Rebecca argues that the trial court should have modified visitation so that the children will not be out of contact with both parents for twenty-four hours at a time. Regarding this finding, the trial court found that Nicholas' great-grandmother and his parents live close by, and thus the children have an extended family upon which they can rely when Nicholas is at work. While there was evidence that the children were able to go to James' garage after school when Rebecca was at work, the evidence also showed that on any given day, the children were only spending about three hours with their mother. Thus, we cannot say that it was an abuse of discretion for the trial court not to alter the standard visitation and for it to determine that it was in the children's best interests to "flip" parenting time.

Because we discern no reversible error with the trial court's findings of fact and conclusions of law, we affirm the February 23, 2011, order of the Lyon Circuit Court.

ALL CONCUR.