RENDERED: OCTOBER 23, 2020; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-1751-MR

MICHELLE CARVER                                                                    APPELLANT

v.              APPEAL FROM BOYD CIRCUIT COURT
                HONORABLE GEORGE W. DAVIS, III, JUDGE
                ACTION NO. 12-CI-00841

LANCE G. CARVER                                                                    APPELLEE

OPINION
REVERSING AND REMANDING

** ** ** ** **

BEFORE: CALDWELL, GOODWINE, AND LAMBERT, JUDGES.

GOODWINE, JUDGE: Lance G. Carver ("Father") sought sole custody of the

parties' child, and Michelle Carver ("Mother") opposed the motion. The Boyd

Family Court determined the parents would continue to have joint custody of the

child, but Father would be the "primary residential custodian" and have the sole

authority to make all decisions concerning the child's medical and educational

needs. Mother appealed. After careful review, we reverse and remand.

# BACKGROUND

This case has a lengthy procedural history. Mother and Father were married in Boyd County on June 23, 2011, one month after the birth of their son, D.C. D.C. has Down syndrome and other serious health issues. On August 21, 2012, Father filed a petition for dissolution in the Boyd Family Court. On April 24, 2013, the family court entered a decree of dissolution, and the parties agreed they would have joint custody of D.C. The parties further agreed Mother would be the primary residential parent and agreed to a parenting schedule for Father. Father had parenting time every other week "from Tuesday at 10:30 a.m. until Wednesday at 10:30 a.m. The alternate week [Father had] parenting time from 10:00 a.m. until 5:00 p.m. on Tuesday." Father agreed to pay child support, but the family court did not set an amount.

Although the parents agreed to this arrangement, the record indicates the parents failed to consistently adhere to the schedule and often disagreed regarding medical care for D.C. Less than a year after the entry of the decree, Father filed a motion to hold Mother in contempt for failing to follow the court's orders. In response, Mother addressed Father's concerns, but asserted he had never paid child support.

However, the family court never set a specific amount of child support. The matter was sent to the Boyd County Domestic Relations

Commissioner ("DRC"), and following a hearing, the DRC recommended Father's child support obligation be set at $60.00 per month. This amount was a deviation from the child support guidelines. The DRC took Father's living expenses into consideration but did not consider Mother's living expenses. Mother filed exceptions to the DRC's report, but the family court overruled her exceptions and accepted the DRC's report as final. Mother moved to alter, amend, or vacate, but the family court denied her motion.

Mother then filed her first appeal in this matter. This Court affirmed the family court's order. The Supreme Court of Kentucky affirmed in part, holding "a deviation from the guidelines was appropriate under the facts of this case." *Carver v. Carver*, 488 S.W.3d 585, 594 (Ky. 2016). However, our Supreme Court reversed this Court's "holding that the DRC did not abuse her discretion in setting Lance's child support at $60 per month based on his living expenses." *Id.* The Supreme Court remanded the case to the family court with the following instructions: "the trial court should first ascertain what is a reasonable amount of support for this child and then determine how much of that support should be the responsibility of each parent." *Id.* The Court noted that, due to the parents' low income, they may "not have enough income to meet *all* of the child's support needs. But based on the reasonable support needs of the child, and each parent's

reasonable ability to pay a portion or all of that support need, a reasonable amount of support obligation for each parent can be determined." *Id.*

On remand, the DRC filed a new report following the Supreme Court's instructions on March 14, 2017. The DRC recommended Father's child support obligation again be set at $60.00. The family court accepted the DRC's report by order entered March 31, 2017.

Two days after the DRC's report was filed, on March 16, 2017, Father moved to terminate his child support obligation. He argued he could not pay the obligation because he had lost his job and was having difficulty finding another one. Father renewed his motion to terminate child support on May 4, 2017, and added complaints regarding issues with exchanging D.C. for visitation. The matter was sent to the DRC, who recommended Father continue to pay $60.00 per month. The family court confirmed the DRC's report by order entered October 13, 2017.

On February 11, 2019, Father filed another motion to terminate his child support obligation. Father argued he had been making payments to Mother, but D.C. was removed from Mother's custody by order of the Court of Common Pleas, Scioto County, Ohio on October 24, 2018. The family court terminated Father's child support obligation by order entered March 1, 2019.

On May 17, 2019, Father filed the underlying motion to modify the existing custody order. Father cited to the Ohio court record in support of his

argument. D.C. had been removed from Mother's custody due to the condition of her home and was found to be a dependent child. Mother opposed the motion, arguing D.C. had since been returned to her care and was thriving.

The DRC heard the motion on July 9, 2019, and filed a report and recommendations on August 27, 2019. The DRC referenced the Ohio court record in the report. D.C. and his younger half-sister were removed from their Mother's care by order entered October 22, 2018, following an investigation by the Scioto County Children Services Board into the condition of Mother's home. Father filed a motion for custody of D.C. in the Ohio court on February 11, 2019. On April 25, 2019, the parties agreed to returning D.C. to the custody of his parents, and the Ohio court "dismissed" Father's custody motion. Record ("R.") at 236. Father then filed the underlying motion in the Boyd Family Court.

The DRC found Father was able to care for D.C. despite suffering from epilepsy and grand mal seizures several times a week because he had a great family support system. "However, [Father] had surgery in January 2019 and had not had a seizure since that time." R. at 259. The DRC cited to the Ohio court record for its finding that Mother's home was unsafe for the children as the home was covered in feces, smelled of ammonia due to animal urine, was cluttered to the point of being unsafe for D.C., and the walls were covered in roaches. There were multiple pets in the home even though her case plan indicated she was not

supposed to have animals there. Mother testified she was unable to care for the home because she had been in the hospital following a car accident, and someone was supposed to care for the animals. The DRC found the car accident occurred at Mother's home. Mother "testified that she got out of the car and [D.C.] managed to get the car out of park and that the car hit [Mother]. On another occasion, [D.C.] had locked the car doors when he was inside and [Mother] was outside." R. at 260.

The DRC noted Father expressed concerns that D.C.'s educational and medical needs were not being met. Father and his family attended D.C.'s medical appointments, but Mother would cancel or reschedule appointments and not let Father know until it was too late. The DRC also stated D.C.'s 2018 IEP review indicated that he had regressed since 2017.

Based on these findings, the DRC made the following recommendations in the best interests of the child: that the parents "shall continue to have joint custody of their minor child. However, [Father] shall be designated as the primary residential custodian. In addition, [Father] shall make all decisions concerning the child's medical and educational needs. [Mother] shall be notified of all of [D.C.'s] doctor's appointments in sufficient time for her to attend if she so chooses." The DRC also recommended Mother have parenting time with D.C. every other weekend and recommended a holiday schedule.

Mother filed exceptions to the DRC's report. However, the family court overruled her exceptions and adopted and confirmed the DRC's report by order entered September 13, 2019. This appeal followed.

**ANALYSIS**

On appeal, Mother argues the family court effectively granted Father sole custody of D.C. without considering the required statutory factors. We review the family court's order under the abuse of discretion standard. *Pennington v. Marcum*, 266 S.W.3d 759, 761 (Ky. 2008).

> Abuse of discretion implies that the family court's decision is unreasonable or unfair. Thus, in reviewing the decision of the family court, the test is not whether the appellate court would have decided it differently, but whether the findings of the family court are clearly erroneous, whether it applied the correct law, or whether it abused its discretion.

*Coffman v. Rankin*, 260 S.W.3d 767, 770 (Ky. 2008) (quoting *B.C. v. B.T.*, 182 S.W.3d 213, 219-20 (Ky. App. 2005)).

First, we must determine whether the family court's order effectively granted Father sole custody of D.C. To do so, we must examine the differences between four types of custody arrangements recognized by Kentucky courts. First, under a sole custody arrangement, one parent has "full control and singular decision-making responsibility for his or her children to the exclusion of the other parent who received a limited period of access to the children through visitation, a

term which denoted the right to see the children, but not to control them legally."

*Pennington*, 266 S.W.3d at 763.

Second, under a joint custody arrangement,

> [b]oth parents have responsibility for and authority over their children at all times. Equal time residing with each parent is not required, but a flexible division of physical custody of the children is necessary. A significant and unique aspect of full joint custody is that both parents possess the rights, privileges, and responsibilities associated with parenting and are expected to consult and participate equally in the child's upbringing.

*Id.* at 764.

Third, "there is in practice a subset of joint custody that combines the concept of joint custody with some of the patterns of sole custody—often called 'shared custody.'" *Id.* Under this arrangement,

> both parents have legal custody that is subject to some limitations delineated by agreement or court order. Unlike full joint custody, time sharing is not necessarily flexible and frequently mirrors a typical sole custody pattern where the child may live with one parent during the week and reside with the other on alternate weekends. The weekend parent does not have "visitation," a sole-custody term which is frequently misused in this context, but rather has "time-sharing," as he or she is also a legal custodian. However, in practice, the terms visitation and timesharing are used interchangeably. Additionally, one parent may be designated the "primary residential parent," a term that is commonly used to denote that the child primarily lives in one parent's home and identifies it as his home versus "Dad's/Mom's house." This concept is frequently

misnamed "primary residential custody."

*Id.* at 764-65.

Fourth, is "[a] less frequently seen category found in practice [that] is a subset of sole custody—split custody." *Id.* at 765. Under this arrangement,

> each parent has sole custody and decision-making authority while the child is in residence with him or her, and only visitation when the child is in residence with the other parent. The term "primary residential custody" may be more appropriate here, depending on how much time the child spends in residence with each parent.

*Id.*

Here, under the original custody order, Mother was the primary residential parent, Father had parenting time one day each week, and both parents had equal decision-making authority. Under the new order, Father was deemed the "primary residential custodian," Mother was given parenting time with D.C. every other weekend, and Father was given greater decision-making authority. Although equal parenting time is not required for a joint custody arrangement, the family court significantly reduced Mother's parenting time and significantly increased Father's. Furthermore, the family court gave Father the sole authority to make decisions regarding D.C.'s medical and educational needs, which seem to be the two most important categories of decision-making regarding D.C.'s upbringing.

Based on our analysis, the DRC's recommendation effectively modified the original custody order. The original custody order reflected a shared

custody arrangement with Mother as the primary residential parent. The modified arrangement made Father the primary residential parent and gave him sole decision-making authority in two major areas affecting D.C.'s life. The DRC's recommendation not only switched the primary residential parent but also moved closer to a full sole custody arrangement by granting Father sole decision-making authority regarding D.C.'s medical and educational needs.

Because the family court effectively modified custody, we must determine whether the family court made the required statutory considerations in reaching its decision. The family court must follow the requirements of KRS[1] 403.340(3) and consider the following factors in modifying custody:

> [T]he court shall not modify a prior custody decree unless after hearing it finds, upon the basis of facts that have arisen since the prior decree or that were unknown to the court at the time of entry of the prior decree, that a change has occurred in the circumstances of the child or his custodian, and that the modification is necessary to serve the best interests of the child. When determining if a change has occurred and whether a modification of custody is in the best interests of the child, the court shall consider the following:
>
> (a) Whether the custodian agrees to the modification;
>
> (b) Whether the child has been integrated into the family of the petitioner with consent of the custodian;
>
> (c) The factors set forth in KRS 403.270(2) to determine the best interests of the child;

---

[1] Kentucky Revised Statutes.

(d) Whether the child's present environment endangers seriously his physical, mental, moral, or emotional health;

(e) Whether the harm likely to be caused by a change of environment is outweighed by its advantages to him; and

(f) Whether the custodian has placed the child with a de facto custodian.

Here, because the DRC determined the parents would maintain joint custody of D.C. but effectively modified the custody arrangement, we are unconvinced the DRC considered the factors required under KRS 403.340(3) in rendering its recommendation. Further, it is unclear whether the DRC made a finding that there was a change in circumstances warranting a modification as required by KRS 403.340(3). A thorough review of the DRC's report reveals that the DRC likely considered some of the best interest factors under KRS 403.270(2) but did not make the required finding of a change in circumstances or apply all required factors under KRS 403.340(3).

Although there may be grounds for modifying the shared custody arrangement or awarding Father sole custody in this instance, the DRC must demonstrate that it adhered to the requirements under KRS 403.340(3) and made the required considerations under KRS 403.340(3)(a)-(f) and KRS 403.270(2) if it intends to do so. As such, we hold the family court abused its discretion by failing

to demonstrate that it applied the correct law in effectively granting Father sole custody of the child.

## **<u>CONCLUSION</u>**

For the foregoing reasons, we reverse the order of the Boyd Family Court and remand with instructions to the DRC to apply KRS 403.340(3) in modifying custody of D.C.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Brandie M. Ingalls
Covington, Kentucky

BRIEF FOR APPELLEE:

Richard A. Hughes
Ashland, Kentucky