**CABINET FOR HEALTH AND FAMILY SERVICES, Commonwealth of Kentucky; and Attorney General, Intervenor, Appellants**

v.

**A.G.G.; and W.E.G., Appellees.**

No. 2005–SC–0631–DGE.

Supreme Court of Kentucky.

April 20, 2006.

G. Thomas Mercer, Cabinet for Families and Children, Office of Legal Services, Louisville, Counsel for Appellant Cabinet for Health and Family Services, Commonwealth of Kentucky.

Gregory D. Stumbo, Attorney General, State Capitol, David A. Smith, Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, Counsel for Appellant Attorney General.

Benjamin D. Rogers, Rogers & Driver, LLP, Glasgow, Counsel for Appellee A.G.G.

Rita E. Riherd, Glasgow, Counsel for Appellee W.E.G.

Opinion of the Court by Justice COOPER.

Appellees A.G.G. ("mother") and W.E.G. ("father") are the natural parents of two boys, N.E.G., born June 15, 1996, and A.E.G., born January 7, 2001. Following a two-day trial, the Barren Family Court entered judgments terminating the parental rights of the mother and father to the two children and committing the children to the custody of Appellant, Cabinet for Health and Family Services ("CHFS"). The Court of Appeals vacated the judgments and remanded for a new trial, perceiving that the family court judge had admitted improper hearsay evidence in contravention of the holdings in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and *G.E.Y. v. Cabinet for Human Resources*, 701 S.W.2d 713 (Ky.App.1985). We granted discretionary review and now reverse the Court of Appeals and reinstate the judgments of the Barren Family Court.

Both parents are mentally disabled due to "lower intellectual functioning." Evidence introduced at trial proved that the family lived primarily at two residences, their own rented mobile home and a residence owned by the children's paternal grandparents. CHFS employees testified at trial that their home visits revealed both residences [1] to be filthy, unsanitary, unsafe for human habitation (broken windows, exposed electrical wires, holes in the ceiling and floor), infested with cockroaches (including one found in A.E.G.'s nebulizer), and strewn with mouse feces. The children and their clothing were filthy, their hygiene was poor, and they emitted a foul odor. CHFS had been attempting with limited success to provide the mother and father with services, including parenting education services, since shortly after N.E.G.'s birth in 1996, and continuously after December 2001. Mostly, the parents ignored their scheduled appointments with social workers. There was evidence that N.E.G. was absent from school nine times and tardy on thirteen other occasions over a two-month period prior to his removal from the custody of his parents. He could neither count nor recite the alphabet. CHFS referred the children to day care, but they failed to attend regularly.

CHFS ultimately learned that two persons (later identified as the children's paternal uncles, J.G. and E.G.), who lived primarily at the paternal grandparents' residence, had been identified as possible sexual offenders. As will be further discussed, *infra*, there was evidence at trial that J.G. sexually abused N.E.G. at the paternal grandparents' residence. A dispositional report prepared by CHFS on June 20, 2002, and adopted as a disposition

---

1. The paternal grandfather refused to admit the Cabinet's employees into his residence; however, they were able to perceive the general condition of the home, including a foul odor, through a broken window.

order by the family court on June 21, 2002, contained numerous recommendations for improvements, including regular school attendance by N.E.G., improved home sanitation and hygiene, and that the children have no contact with their paternal grandfather and other named members of their father's extended family.

On October 17, 2002, the children were removed from the custody of their mother and father and placed in foster care because of the failures of the mother and father to abide by the provisions of the disposition order. On October 21, 2002, the family court held both parents in contempt of court for violating the conditions of the order. The foster mother later reported to CHFS that she had observed N.E.G. sexually "acting out" with A.E.G. and other children. On October 1, 2003, almost a year after the children were removed from their parents' custody, and after repeated unsuccessful attempts to convince the mother and father to respond to family services and to upgrade their living conditions so that they could be reunited with their children, CHFS filed this petition for involuntary termination of their parental rights.

Among the findings of fact entered by the family court in support of its judgments were, *inter alia:*

8. [N.E.G. and A.E.G.] are abused and neglected children as defined in KRS 600.020(1) and termination of parental rights would be in the best interest of the children; in that Respondents have caused or allowed each child to be sexually abused or exploited (See also KRS 625.090(2)(f) and KRS 600.020(1)(e)) and in that Respondents have failed to provide sanitary living conditions in the children's home (See also KRS 625.090(2)(e) and KRS 600.020(1)(d)).

9. [The mother and father] have caused or allowed the children to be sexually abused or exploited.

10. [The mother and father], for a period of not less than six (6) months have continuously or repeatedly failed or refused to provide or have been substantially incapable of providing essential parental care and protection for the children and there is no reasonable expectation of improvement in parental care and protection, considering the age of the children.

11. [The mother and father], for reasons other than poverty alone, have continuously or repeatedly failed to provide or are incapable of providing essential food, clothing, shelter, medical care or education reasonably necessary and available for the children's well-being and there is no reasonable expectation of significant improvement in the parents' conduct in the immediately foreseeable future, considering the age of the children.

12. It is in the best interest of [N.E.G. and A.E.G.] that termination of parental rights be ordered because the children need the stability provided by CHFS placing them for adoption.

13. CHFS has rendered or attempted to render all reasonable services to [the mother and father] in an effort to bring about a reunion of the family.

14. [The mother and father] have made few, if any, adjustments in their circumstances, conduct or conditions to make it in the best interest of the children to be returned home.

15. [N.E.G. and A.E.G.] have made substantial improvements while in foster care and they are expected to make more improvements upon termination of parental rights.

## I. SUFFICIENCY OF THE EVIDENCE.

Parental rights are so fundamentally esteemed under our system that they are accorded Due Process protection under the Fourteenth Amendment of the United States Constitution. *O.S. v. C.F.,* 655 S.W.2d 32, 33 (Ky.App.1983). They can be involuntarily terminated only if there is clear and convincing evidence that the child has been abandoned, neglected, or abused by the parent whose rights are to be terminated, and that it would be in the best interest of the child to do so. KRS 625.090; *Santosky v. Kramer,* 455 U.S. 745, 769–70, 102 S.Ct. 1388, 1403, 71 L.Ed.2d 599 (1982); *N.S. v. C & M.S.,* 642 S.W.2d 589, 591 (Ky.1982).

The family court's findings of facts set forth above were not clearly erroneous, CR 52.01, and were supported by clear and convincing evidence. While the evidence that N.E.G. was sexually abused was stronger than the evidence that A.E.G. was sexually abused, there was ample evidence that the parents "[c]reate[d] or allow[ed] to be created a risk that an act of sexual abuse ... [would] be committed upon [A.E.G.]," KRS 600.020(1)(f), when they ignored the disposition order's mandate that the children not be taken to the home of the paternal grandparents and either ignored or failed to notice that A.E.G. was being sexually abused by N.E.G. Further, while abandonment or abuse of an older child alone is not clear and convincing evidence sufficient to support termination of parental rights to a younger child, such evidence coupled with other evidence of abuse or neglect of the younger child may be sufficient. *O.B.C. v. Cabinet for Human Res.,* 705 S.W.2d 954, 956 (Ky.App.1986).

## II. HEARSAY.

The Court of Appeals vacated the judgments because it perceived that the testimony of N.E.G.'s therapist, Julie Griffey, and that of Dr. Jeffrey Blackerby, a pediatrician, violated the proscription against the introduction of testimonial hearsay enunciated in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). We disagree.

Julie Griffey is a licensed marriage and family therapist employed by "Life Skills," a regional comprehensive care center. She holds a masters degree in marriage and family therapy and has twenty-seven years of experience in the field. "Years ago," Life Skills designated her as its specialist in child sexual abuse, a designation requiring continuing education in sexual abuse, including child-interviewing skills. Due to behavioral problems exhibited by N.E.G. while still living with his parents, CHFS referred him to Griffey for diagnosis and therapy. Griffey testified that during the initial session on July 25, 2002, N.E.G. made no statements indicating that he had been sexually abused. Two follow-up appointments were scheduled but not kept. Griffey did not see N.E.G. again until October 24, 2002, after he was removed from the custody of his parents. She testified that, on this occasion, N.E.G. exhibited delayed speech, aggression, and disruptive behavior. Again, however, he made no statements indicating that he had been sexually abused. Griffey saw N.E.G. again on May 23, 2003, after being advised of the foster mother's report that N.E.G. was exhibiting sexually aggressive behavior. This time, Griffey initiated a "good touch—bad touch" vocabulary with N.E.G., using anatomically correct dolls. Griffey testified that during this session, N.E.G. described being sexually abused by his two uncles, especially J.G., and by both of his parents. Specifically, he told Griffey that J.G. had made him put his mouth on J.G.'s penis and that J.G. had ejaculated into his

mouth. According to Griffey, N.E.G. repeated these allegations during another therapy session on June 9, 2003. During another session on September 19, 2003, when Griffey questioned N.E.G. about a report that he had performed oral sex on a playmate, N.E.G. responded that both J.G. and his father had "done this" to him while his mother was away from home. Griffey testified that she did not "grill" the child on the details of the abuse because her job as a therapist is to "help a victim compartmentalize and then decrease the thoughts and memories of any sexual abuse," rather than to prepare the victim for testimony in court by "grinding it in."

Dr. Jeffrey Blackerby, a pediatrician, physically examined both children on July 15, 2003, and testified that A.E.G.'s physical examination was normal. However, he testified that N.E.G.'s examination revealed "anal dilation" that was "somewhat suspicious" because it is common where there has been anal penetration, but that it was not necessarily abnormal. When Dr. Blackerby specifically asked N.G. about sexual abuse, the child was reluctant to respond. When asked how many times "this had happened" with J.G., N.E.G. responded that J.G. had abused him many times; that it happened at "J.G.'s house" and that his "nanny and pa" and uncle (E.G.) lived there too; and that his mother and father were there when the abuse occurred but that they did not see it happen. N.E.G. then confirmed to Dr. Blackerby that what he had told Griffey was true.

KRS 625.080(2) provides, *inter alia:*

Upon motion of any party, the child may be permitted to be present during the proceedings and to testify if the court finds such to be in the best interests of the child. In its discretion, the Circuit Court may interview the child in private, but a record of the interview shall be made ....

N.E.G. was not present at the trial and did not testify by videotaped deposition or otherwise. Nor was he interviewed by the family court judge. No motion for his presence or his testimony was made. Thus, he was not available for cross-examination.

### A. KRE 803(4).

 Under our existing case law, the statements made by N.E.G. to both Griffey and Blackerby were admissible under KRE 803(4), the hearsay exception for statements made for purposes of medical treatment or diagnosis, even though Griffey was not a physician. In *Edwards v. Commonwealth,* 833 S.W.2d 842 (Ky.1992), an appeal from a criminal conviction of sodomy and sexual abuse, we upheld testimony of a physician and a clinical psychologist, both of whom related the history of sexual abuse conveyed to them by the child victim, including the identity of the perpetrator. *Id.* at 844–45. The clinical psychologist testified that the child was referred to her for two purposes: "(1) to see if a trained therapist could help him explain what had happened to him, and (2) to evaluate his treatment needs and to make treatment recommendations." *Id.* at 844. Thus, her "purpose in seeing [the child] was to determine what had happened to the child and what therapy or treatment was needed." *Id.* at 845.

In *Prater v. Cabinet for Human Resources,* 954 S.W.2d 954 (Ky.1997), an appeal from a judgment terminating parental rights, we held that a physician diagnosing and treating a child for suspected abuse could testify to the child's history with respect to the etiology of his injuries and, thus, that the physician's report of the child's history was admissible under the hearsay exception for business records,

KRE 803(6). *Id.* at 960. And in *Stringer v. Commonwealth*, 956 S.W.2d 883 (Ky. 1997), an appeal from a criminal conviction of sodomy and sexual abuse, we held that a certified psychological counselor and cognitive therapist with a masters degree in counseling and eighteen years experience in the field, who testified that his purpose in counseling the child victim was to address any emotional problems the child may have been suffering as a result of sexual abuse, could repeat statements made to him by the child describing the abuse. *Id.* at 888. Finally, in *Garrett v. Commonwealth*, 48 S.W.3d 6 (Ky.2001), we upheld testimony by a pediatrician who had examined the child victim for signs of sexual abuse, including testimony that repeated the history related to her by the child. *Id.* at 14. In doing so, we held that the adoption of KRE 803(4) had eliminated any distinction between treating and examining physicians with respect to such testimony. *Id.*

Similarly, the United States Court of Appeals for the Sixth Circuit, construing Federal Rule 803(4), which is identical to KRE 803(4), recently held that a licensed psychotherapist and state-certified clinical social worker specializing in child sexual abuse could testify to verbal disclosures made to her by victims of child sexual abuse describing the abuse even though the witness, like the witness in *Edwards*, did not, herself, provide therapy but only interviewed the children for the purpose of diagnosis to determine what treatment would be appropriate. *United States v. Kappell*, 418 F.3d 550, 556 (6th Cir.2005). "Waters testified that these interviews were needed to obtain the information necessary for an accurate medical diagnosis before seeking mental health treatment for the children." *Id.* at 552. Griffey testified

similarly, except that she intended to provide any needed therapy for N.E.G.'s mental health problems. As noted in *Kappell, id.* at 556, several other federal circuit courts of appeals have recognized that Rule 803(4) covers statements made to non-physicians. *See United States v. Running Horse*, 175 F.3d 635, 638 (8th Cir. 1999) (applying Rule 803(4) to a child victim's statements to a psychologist); *United States v. Tome*, 61 F.3d 1446, 1451 (10th Cir.1995) (noting that the rule could apply to a child victim's statements to a state caseworker, if the subject matter was "reasonably pertinent" to medical diagnosis or treatment); *United States v. Yellow*, 18 F.3d 1438, 1442 (8th Cir.1994) (stating that the rule could apply to a child victim's statements to "psychologists or trained social workers, provided that the declarant was seeking treatment"); *Morgan v. Foretich*, 846 F.2d 941, 949–50 & n. 17 (4th Cir.1988) (same, for psychologists and psychiatrists).

### B. *Crawford v. Washington.*

■ The Court of Appeals' reliance on *Crawford v. Washington* was misplaced. *Crawford* was a criminal case, and its reasoning turned solely on the language of the Confrontation Clause of the Sixth Amendment to the United States Constitution.

> The question presented is whether this procedure complied with the *Sixth Amendment's guarantee* that, "[i]n all *criminal prosecutions*, the accused shall enjoy the right ... to be confronted with the witnesses against him."

*Crawford*, 541 U.S. at 38, 124 S.Ct. at 1357 (emphasis added).[2] After studying at length the historical origins of the Confrontation Clause, the Court noted that "the principal evil at which the *Confronta-*

---

**2.** *See also* Ky. Const. § 11 ("In all *criminal prosecutions* the accused has the right ... to meet the witnesses face to face ...." (Emphasis added.)).

*tion Clause* was directed was the civil-law mode of *criminal procedure,* and particularly its use of *ex parte* examinations as evidence against *the accused.*" *Id.* at 50, 124 S.Ct. at 1363 (emphasis added).

Accordingly, we once again reject the view that the *Confrontation Clause* applies of its own force only to in-court testimony, and that its application to out-of-court statements introduced at trial depends upon "the law of Evidence for the time being." Leaving the regulation of out-of-court statements to the law of evidence would render the *Confrontation Clause* powerless to prevent even the most flagrant inquisitorial practices.

*Id.* at 50–51, 124 S.Ct. at 1364 (emphasis added) (citations and quotations omitted). Further:

The historical record also supports a second proposition: that the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination. *The text of the Sixth Amendment* does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts.

*Id.* at 53–54, 124 S.Ct. at 1365 (emphasis added). And,

Where testimonial statements are involved, we do not think the Framers meant to leave the *Sixth Amendment*'s protection to the vagaries of the rules of evidence, much less to amorphous notions of "reliability."

*Id.* at 61, 124 S.Ct. at 1370 (emphasis added). Finally,

In this case, the State admitted Sylvia's testimonial statement against petitioner, despite the fact that he had no opportunity to cross-examine her. That alone is sufficient to make out a *violation of the Sixth Amendment.* *Roberts* notwithstanding, we decline to mine the record in search of indicia of reliability. Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation.

*Id.* at 68–69, 124 S.Ct. at 1374 (emphasis added).

■■■■■ Nothing in *Crawford* suggests that its reasoning was intended to apply where the Sixth Amendment does not apply; and the Sixth Amendment does not apply to civil cases. *United States v. Zucker,* 161 U.S. 475, 481, 16 S.Ct. 641, 643, 40 L.Ed. 777 (1896); *U.S. Steel, LLC, v. Tieco, Inc.,* 261 F.3d 1275, 1287 n. 13 (11th Cir.2001) ("Of course, the Confrontation Clause is not applicable to civil cases ...."); *Santibanez v. Wier McMahon & Co.,* 105 F.3d 234, 243 (5th Cir.1997). A civil litigant's right of confrontation and cross-examination is grounded in the Due Process Clauses of the Fifth and Fourteenth Amendments. *Willner v. Comm. on Character and Fitness,* 373 U.S. 96, 103, 83 S.Ct. 1175, 1180, 10 L.Ed.2d 224 (1963) ("[P]rocedural due process often requires confrontation and cross-examination of those whose word deprives a person of his livelihood."); *Nevels v. Hanlon,* 656 F.2d 372, 376 (8th Cir.1981). However, confrontation and cross-examination are not rights universally applicable to civil proceedings. *Vitek v. Jones,* 445 U.S. 480, 494–96, 100 S.Ct. 1254, 1264–65, 63 L.Ed.2d 552 (1980) (prisoner being transferred to mental hospital for involuntary psychiatric treatment may be denied right to confront and cross-examine witnesses upon finding of good cause); *Wolff v. McDonnell,* 418 U.S. 539, 567, 94 S.Ct. 2963, 2980, 41 L.Ed.2d 935 (1974) (right to confront and cross-examine witnesses may

be denied in inmate civil rights proceeding challenging constitutionality of prison disciplinary proceedings); *United States v. Alisal Water Corp.*, 431 F.3d 643, 658 (9th Cir.2005) ("[I]n the context of a civil suit, cross-examination is not, in every instance, a sine qua non of due process. It all depends on the situation.") (quotations omitted). The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976). Due process requires only that the evidence be "reliable," and "reliability can be inferred without more in a case where evidence falls within a firmly rooted exception to the hearsay rule." *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980), *overruled as applied to criminal cases by Crawford*.

*See also United States v. Medico*, 557 F.2d 309, 314 n. 4 (2d Cir.1977) (Admission of hearsay statements "turns on due process considerations of fairness, reliability and trustworthiness. Experience has taught that the stated exceptions now codified in the Federal Rules of Evidence meet these conditions."); *Commonwealth v. Durling*, 407 Mass. 108, 551 N.E.2d 1193, 1198 (1990) ("Evidence which would be admissible under standard evidentiary rules is presumptively reliable.").

Prior to *Crawford*, it was almost universally held that the right to personally confront and cross-examine witnesses was not required in a civil action to terminate parental rights.[3] The jurisdictions that have considered the issue after *Crawford* was decided have held that *Crawford* has no application to those or similar cases.[4] We

---

**3.** *See In re A.S.W.*, 834 P.2d 801, 806 (Alaska 1992) (father's due process rights not denied by the fact that he was unable to cross-examine daughter who accused him of abuse in CINA (child in need of assistance) proceeding); *People ex rel. V.M.R.*, 768 P.2d 1268, 1270 (Colo.Ct.App.1989) (incarcerated father involuntarily absent from proceeding but represented by counsel); *Interest of L.K.S.*, 451 N.W.2d 819, 822 (Iowa 1990) ("Textually, then, it is clear that the confrontation clause applies only in criminal cases. CHINA [child in need of assistance] proceedings are not criminal cases."); *In re Brock*, 442 Mich. 101, 499 N.W.2d 752, 758–59 (1993) (upholding presentation of child's testimony against parents by videotaped deposition); *In re Faircloth*, 153 N.C.App. 565, 571 S.E.2d 65, 71 (2002) ("A termination of parental rights hearing is a civil rather than criminal action, with the right to be present, to testify, and to confront witnesses subject to 'due limitations." '); *In re J.S.P.L.*, 532 N.W.2d 653, 660 (N.D.1995) ("Sixth Amendment right to confront and cross-examine witnesses applies to criminal prosecutions, not to civil proceedings for termination of parental rights."); *In re Smith*, 77 Ohio App.3d 1, 601 N.E.2d 45, 55 (1991) (upholding testimony of children's therapists repeating children's descriptions of sexual abuse by parents); *In re Rich*, 604 P.2d

1248, 1253 (Okla.1979) ("Courtroom confrontation with one's civil adversary is not required either by due process or other constitutional strictures."); *In re James A.*, 505 A.2d 1386, 1390–91 (R.I.1986) (upholding *in camera* interview of child by judge, subject to conditions); *People ex rel. G.R.F.*, 569 N.W.2d 29, 33 (S.D.1997) ("[P]rocedures determining the custody of dependent children are not criminal, are not quasi-criminal, but instead constitute a civil action, or a special proceeding of a civil nature."); *State ex rel. E.D. v. E.J.D.*, 876 P.2d 397, 401 (Utah Ct.App.1994) (noting that Rule 803(4) would apply to admission of statements made by children to physician in proceeding to terminate parental rights).

**4.** *In re April C.*, 131 Cal.App.4th 599, 31 Cal. Rptr.3d 804, 811–12 (2005) (juvenile dependency proceeding); *People v. Angulo*, 129 Cal. App.4th 1349, 30 Cal.Rptr.3d 189, 201–02 (2005) (civil commitment proceeding); *In re C.M.*, 351 Ill.App.3d 913, 286 Ill.Dec. 839, 815 N.E.2d 49, 52 (2004) (guardianship proceeding premised upon child neglect and abuse); *Commonwealth v. Given*, 441 Mass. 741, 808 N.E.2d 788, 794 n. 9 (2004) (civil commitment proceeding); *In re G.G.N.*, 372 N.J.Super. 42, 855 A.2d 569, 579 (2004) ("We have found no case in any jurisdiction that

347

agree with these authorities and hold that *Crawford* has no application to this action for involuntary termination of parental rights, which is a civil, not a criminal, proceeding. Thus, there is no need to determine whether statements made by a seven-year-old child to a sexual abuse therapist within the confines of the therapist's office are "testimonial" in nature.[5]

### C. G.E.Y. v. Cabinet for Human Resources.

The Court of Appeals' reliance on *G.E.Y. v. Cabinet for Human Resources*, 701 S.W.2d 713 (Ky.App.1985), for the proposition that hearsay exceptions do not apply in proceedings for termination of parental rights was also misplaced. The Court of Appeals held in *G.E.Y.* that it was error to admit the Cabinet's entire case record into evidence under the common law[6] "shopbook" exception to the hearsay rule because:

> The worker's narrative record in the instant case contains, in part, bits and pieces of gossip gathered from all over creation, the sources of which are frequently unidentified. The record contains the subjective and unverifiable impressions of the workers and their

contacts of G.E.Y. and letters from third parties who did not testify containing highly inflammatory and prejudicial accusations against the appellant. *Id.* at 715.

In *Cabinet for Human Resources v. E.S.*, 730 S.W.2d 929 (Ky.1987), we narrowed the holding in *G.E.Y.* to permit the introduction of those portions of the Cabinet's investigation file that would have been admissible if the social worker had testified in person.

> [I]t is the opinions and conclusions expressed in the social worker's records, rather than the factual observations, which cause difficulty. We hold that those entries in the case record made by the social worker which constitute statements of factual observations are admissible under the business entries exception to the hearsay rule, and those statements which express opinions and conclusions are not.

*Id.* at 932. As we later explained in *Prater v. Cabinet for Human Resources*, 954 S.W.2d 954 (Ky.1997), also an action for termination of parental rights:

> [E]ven if a public agency's investigative report satisfies the foundation requirements of KRE 803(6), that does not

has extended *Crawford* to a civil commitment proceeding where the burden of proof is less than beyond a reasonable doubt."); *In re D.R.*, 616 S.E.2d 300, 303 (N.C.Ct.App.2005) (holding *Crawford* analysis not applicable in action for involuntary termination of parental rights); *In re S.A.*, 708 N.W.2d 673, 679 (S.D. 2005) (same).

**5.** *But see Crawford*, 541 U.S. at 52, 124 S.Ct. at 1364 (endorsing the view that statements were testimonial if, *e.g.*, they "were made under circumstances which would lead an objective witness reasonably to believe that the statement[s] would be available for use at a later trial."); *People v. Vigil*, 127 P.3d 916, 923 (Colo.2006) (statements made by child sexual abuse victim to examining physician admissible under Rule 803(4) and not testi-

monial in nature); *State v. Scacchetti*, 690 N.W.2d 393, 396 (Minn.Ct.App.2005) (holding statement made by child victim in response to nurse practitioner's inquiry as to whether anything had happened not testimonial in nature); *State v. Vaught*, 268 Neb. 316, 682 N.W.2d 284, 291 (2004) (holding statement made by child sexual abuse victim to emergency room physician not testimonial in nature); *State v. Fisher*, 130 Wash.App. 1, 108 P.3d 1262, 1269 (2005) (holding statement made by child victim to doctor at hospital in response to doctor's inquiry as to "what happened?" admissible under Washington's equivalent of KRE 803(4) and not testimonial in nature).

**6.** Kentucky did not codify its rules of evidence until July 1, 1992. KRE 107(b).

authorize a carte blanche admission of each individual entry contained in the report. KRE 803(6) and KRE 803(8) only satisfy the hearsay aspects of the business or public record, itself. If a particular entry in the record would be inadmissible for another reason, it does not become admissible just because it is included in a business or public record.

*Id.* at 958.

*Prater* also upheld the admission under KRE 803(4) of statements made by child sexual abuse victims to the physician to whom they had been referred for examination, diagnosis, and treatment; and under KRE 803(3) (the "state of mind" exception to the hearsay rule) of statements by the children expressing fear of the dark. *Id.* at 960. Clearly, *G.E.Y.* is no longer (if it ever was) authority for the proposition that hearsay exceptions do not apply in actions to terminate parental rights.

In conclusion, the holdings in *Crawford v. Washington* and *G.E.Y. v. Cabinet for Human Resources* do not preclude introduction of the statements made by N.E.G. to Julie Griffey and Dr. Jeffrey Blackerby; and the statements were properly admitted under KRE 803(4).

Accordingly, we reverse the Court of Appeals and reinstate the judgments of the Barren Family Court.

All concur.