v.

CABINET FOR HEALTH AND FAMILY SERVICES, Commonwealth of Kentucky; L.S.S.; and H.K.R., Jr., a Child, Appellees

NO. 2016-CA-000427-ME

Court of Appeals of Kentucky.

MAY 19, 2017; 10:00 A.M.

MODIFIED: MAY 26, 2017; 10:00 A.M.

BRIEF FOR APPELLANT: Richard F. Dawahare, Lexington, Kentucky.

BRIEF FOR APPELLEE: Kristin L. Wehking, Lexington, Kentucky.

BEFORE: JOHNSON, JONES, AND THOMPSON, JUDGES.

## OPINION

JONES, JUDGE:

Appellant, H.M.R. ("Father"), appeals from the Fayette Circuit Court's termination of his parental rights. After careful review of the record, we reverse.

### I. BACKGROUND

Child was born to L.A.S. ("Mother") and Father on September 22, 2007, in Cincinnati, Ohio. Father was listed as Child's biological father on Child's birth certificate. While Mother and Father were never married, they resided together, with Child, for the first three years of Child's life. When Child was three-years-old, Child moved to Lexington, Kentucky with Mother who was caring for her own ailing mother. Father remained in Cincinnati. There was never a formal custody arrangement or a child support order entered. Despite not having a vehicle, Father testified that he "caught rides" with friends twice a month to visit with Child and bring Child gifts and money. When Child was five-years-old, he came to live with Father and Father's sister in Cincinnati, where he resided for approximately 6-8 months. For reasons that are not entirely clear from the record, Child returned to live with Mother in Lexington, Kentucky.

In November of 2013, the Cabinet for Health and Family Services (the "Cabinet") removed Child from Mother's care due to Child's truancy and Mother's substance abuse issues. A Dependency, Neglect, or Abuse ("DNA") hearing was held on November 20, 2013, at which time Mother stipulated to probable cause of neglect. While there were no claims concerning Father, he was present at the DNA

hearing. However, Mother had recently made statements that Father may not, in fact, be Child's father. Accordingly, the trial court ordered Father to submit to a paternity test. Because Father was still living in Ohio, the trial court additionally ordered that Father be drug tested, and that the Cabinet complete an ICPC[1] assessment to determine if Father would be a suitable placement for Child. Child was placed in foster care pending completion of Father's ICPC assessment.

Father submitted to a full-panel drug test immediately following court, and tested positive for cannabinoids. The test returned negative results for all other substances tested. A finding of neglect was found against Mother on January 8, 2014.[2] However, while Father did attend the DNA proceedings, he was not accused of any abuse or neglect of Child as part of those proceedings.

Father's blood was taken for the court-ordered paternity test on January 30, 2014. On February 12, 2014, the Cabinet submitted a DNA Dispositional Report to the trial court, which indicated that it had communicated with Father regarding his desires to work a case plan to gain custody of Child, and set up a meeting for him to do so. While both Lauren Barker, Child's case worker, and Father have testified to the fact that Father did attend a family team meeting at some point, there is no indication in the record as to when this meeting occurred. Ms. Barker testified that at this meeting she asked Father to complete several tasks. These included: drug screening when ordered through an Ohio provider, cooperating with the ICPC process, completing a substance abuse as-

---

1. Interstate Compact on Placement of Children. KRS (Kentucky Revised Statutes) 615.030.

2. Mother was present at the hearing on November 20, 2013; however, she has not attended any hearing since then. Mother is not a party to this appeal.

sessment, and following the recommendations of that assessment. Any written case plan, or any reference to a case plan for Father, is absent from the record.[3] On June 26, 2014, Father's paternity test was returned confirming that he was Child's father. The reason for the delay in the results is unclear. The Cabinet filed a recommendation with the trial court on July 23, 2014, by which it acknowledged that Father's paternity had been confirmed, and stated that it would complete the ICPC on Father. Additionally, the July 23, 2014, recommendation stated that Father had made contact with the Cabinet and again requested a case plan.

On October 2, 2014, the Cabinet requested the ICPC home visit at Father's home. The completed ICPC assessment, which denied Child's placement with Father, was filed in Fayette Circuit Court on January 7, 2015.[4] In her letter explaining why she believed custody was inappropriate, the custody director who completed Father's home study stated numerous reasons, including that: Father had initially given his nephew's address, where he received mail, instead of the address where he was currently residing; Father's live-in girlfriend was absent, despite the fact that Father was informed it was imperative that she be present, at the time of the home visit; Father did not have stable employment; Father had four previous drug possession charges, and had additionally been charged with aggravated menacing during the pending ICPC assessment; and that Father had entered a guilty plea and been convicted of sexual battery when he was 17-years-old. In concurrence with filing the ICPC assessment denial, the Cabinet filed a recommendation requesting that the trial court grant waiver of reasonable efforts as to both Mother and Father, and that Child's status be changed to "adoption."

The Cabinet filed a petition for termination of parental rights on February 20, 2015. Because the Cabinet's petition stated that Father's current whereabouts were unknown, a Guardian ad Litem ("GAL") was appointed for him by the trial court. The GAL filed her report on April 1, 2015. In the report she stated that she had contacted Mother in an attempt to locate Father. Shortly thereafter, she received a telephone call from Father. Father stated that he opposed any attempt to terminate his parental rights to Child. Following this conversation, the GAL forwarded Father a letter explaining the petition; however, the petition was not attached with the letter.

A termination of parental rights hearing was held on June 22, 2015, at which Father appeared. Ms. Barker testified that she believed Father was uncooperative with the ICPC assessment, although she did agree that Father had been present at every meeting arranged with the custody worker. She further testified that Father had not requested that visitation with the Child be arranged, had not seen the Child since the Child had been placed in foster care, and had not provided support for Child while the Child was in foster care. Father testified, explaining that he had been unable to get to Lexington and did

3. Any form referencing a case plan in the record only refers to Mother. Spaces under Father's name are left blank, or are checked N/A when asked if he is in compliance with his case plan or if he is utilizing the Cabinet's services. Similarly, while the record has several court orders for Mother to drug test, there are none for Father (with the exception of the November 20, 2013 order).

4. The letter from the custody director to Hamilton County Job & Family Services is dated November 20, 2014. It is unclear from the record what caused the delay between the completion of the ICPC assessment and any action by the Cabinet.

not know where the Child was, besides the fact that the Child was being cared for in foster care. He explained that he was no longer able to get rides to Lexington, and that he could not afford the $80 Greyhound bus ticket.

Father also testified regarding his lack of clarity with respect to the Cabinet. He testified that he had not received any communication from the Cabinet. He stated that he could not contact Ms. Barker, as he had lost the phone in which her number was saved and does not have access to the Internet to look up her information. He further stated that Mother had informed him that he should not send items to the Cabinet for Child because the Cabinet would not give them to Child. Father denied that he had been uncooperative with the ICPC assessment.

At the conclusion of the hearing, the trial court announced that it was not going to terminate Father's parental rights. The trial court went through each ground under KRS 600.020, and explained why it did not believe it was applicable to Father. These findings were repeated in the trial court's Findings of Fact and Conclusions of Law, entered December 10, 2015.[5] In brief, the trial court declined to terminate Father's parental rights over Child because: it could not find that father had abandoned Child when Father believed that Child was being cared for in foster care; Father had been failed by the Cabinet and the court in regards to the working of his case plan; it could not find that Father was likely to abuse Child based on Father's previous sexual battery charge; Father's case plan contained only a few items and Father's ICPC was delayed,

through no fault of either party; and, while Father did not pay child support, there was no child support order.

The Cabinet filed a motion to alter, amend, or vacate under CR [6] 59.05 on December 21, 2015. On March 8, 2016, the trial court issued an opinion granting the Cabinet's motion. By its opinion, the court stated that it had made errors of law in finding that Father had not abandoned the Child, and, as such, found that there was sufficient evidence to find that Father had abandoned Child. Evidence cited by the trial court included that: Father had acquiesced all parental care to the Cabinet for a period of greater than 90 days; Father failed to move to set up visitation with Child through the court or the Cabinet; Father had not provided financial support since November of 2013, when Child was placed in foster care; Father had failed to complete a basic case plan; Father admitted that he had used marijuana from the age of 14 on, and failed to drug test in Ohio despite the fact that the Cabinet offered to make arrangements for him to do so; and Father failed to maintain contact with both Ms. Barker and the Child. Among those reasons cited, the court put special emphasis on the fact that Father had failed to complete even the most basic of case plans, stating that "[w]hile he may not have had a specific and detailed case plan, the Father *did* have a case plan to work." R. 104. Following its analysis as to Father's abandonment of Child, the trial court conducted a best interest analysis. The trial court noted that there was a high likelihood that Child would be adopted by his foster parent should Father's parental

---

**5.** The trial court previously filed an Order on August 26, 2015, declining to terminate Father's parental rights. The August 26 Order was very brief, and the Cabinet made a motion for more specific findings of fact on September 4, 2015. The December 10, 2015 Findings of Fact and Conclusions of Law, which is far more detailed, was entered in response to the Cabinet's motion.

**6.** Kentucky Rules of Civil Procedure.

rights be terminated. Further, the trial court noted that based on the length of time that Child had been in foster care, and Father's inability to make progress on his basic case plan, the court could not find that Father will be able to make sufficient progress to regain custody of Child. As such, the trial court found that it was in Child's best interests to terminate Father's parental rights.

This appeal followed.

## II. STANDARD OF REVIEW

Because of the broad discretion given to trial courts in determining whether a child is abused or neglected, therefore necessitating the termination of parental rights, this Court's review of such decisions is limited to the clearly erroneous standard. *M.P.S. v. Cabinet for Human Res.*, 979 S.W.2d 114, 116 (Ky. App. 1998). A trial court's order is clearly erroneous if it is unsupported by substantial evidence on the record. *V.S. v. Com., Cabinet for Human Res.*, 706 S.W.2d 420, 424 (Ky. App. 1986).

## III. ANALYSIS

KRS 625.090 sets forth the grounds for involuntary termination of parental rights. The first requirement of the statute requires the trial court to find from clear and convincing evidence that:

1. The child has been adjudged to be an abused or neglected child, as defined in KRS 600.020(1), by a court of competent jurisdiction;

2. The child is found to be an abused or neglected child, as defined in KRS 600.020(1), by the Circuit Court in this proceeding; or

3. The parent has been convicted of a criminal charge relating to the physical or sexual abuse or neglect of any child and that physical or sexual abuse, neglect, or emotional injury to the child

named in the present termination action is likely to occur if the parental rights are not terminated . . . .

KRS 625.090(a).

█ While it is true that Child was found to be abused and neglected in the prior juvenile proceedings, that action was against Mother. While Father appeared, he was not accused or found to have abused or neglected Child as part of that proceeding. Therefore, the family court was required to make a finding as part of the termination that Father abused or neglected Child. *See Cabinet for Health & Family Servs. v. K.H.*, 423 S.W.3d 204, 210 (Ky. 2014).

In its amended order of March 8, 2016, the trial court concluded that Father had abandoned Child during the time Child was in foster care. Father does not dispute that he did not support or visit Child while Child was in foster care. However, he attributes his failure to do so to the Cabinet's inaction in establishing a case plan for him and its failure to provide clear directives to him. On appeal, Father argues that the trial court erred in finding that he abandoned Child such that it would constitute abuse or neglect. Father asserts that for abandonment to be present, he must have been shown to evince a settled purpose to forego all parental duties, and that he, in fact, did the opposite of that.

This is a difficult case. Father did provide for and visit with Child prior to Child's removal from Mother's custody. In fact, Child resided with Father at various points after his birth and later for a period of several months. There is no evidence that Father abused or failed to care for Child during these periods. Additionally, even after Child moved to Lexington, Kentucky with Mother, Father continued to visit at least twice a month and to support Child with gifts and money. And, Father

attended the DNA hearing against Mother where he represented to the court and the Cabinet that he wanted to assume custody, if possible. Father voluntarily submitted to a paternity and drug test immediately following the hearing. He also attended an initial meeting with the Cabinet. Likewise, Father took swift action after being notified of the termination proceedings.

It is undisputed that Father did not visit with and support Child after he was placed in foster care. However, for reasons that are not clear, Father does not appear to have ever been provided with a written and clear case plan from the Cabinet. When fundamental basic rights such as the right to parent one's own child are at issue it is incumbent to consider the facts in conjunction with the circumstances of each individual case. In isolation these facts might be suggestive of abandonment. However, courts do not deal with facts in isolation. This is especially true in this case where we must determine whether the facts support the conclusion that Father evinced a settled purpose to "forego all parental duties and relinquish all parental claims to the child." *O.S. v. C.F.*, 655 S.W.2d 32, 34 (Ky. App. 1983).

■ "Abandonment is a matter of intent which may be proved by external facts and circumstances...." *J.H. v. Cabinet for Human Res.*, 704 S.W.2d 661, 663 (Ky. App. 1985). While Father was orally told some things he would need to do to gain custody, it does not appear that the Cabinet assisted him in completing these tasks or had any type of written plan approved by the court. Likewise, it does not appear that the Cabinet provided Father with any information as to how or where to submit support for Child or provided him any indication that he could visit with Child. This is troubling on a number of levels, especially since Father appears to have been involved in Child's life prior to Child's commitment to foster care. Could Father have done more? Yes. Should Father have been more proactive? Probably. Even though Father could have taken more proactive steps, we must conclude that the family court erred to the extent it determined that the facts presented in this case rise to the level of parental abandonment.

■ To this end, we must point out that although the trial court repeatedly referenced Father's failure to work his case plan, we cannot locate any such plan in the record.[7] Indeed, it appears that no such plan was ever put to writing as the trial court observed in its August 2015 Order, wherein it stated that "[Father] was not

---

7. The Cabinet argues that Father failed to preserve the lack of a specific case plan as an issue in the proceedings below, and therefore, we should not consider that issue on appeal. As recently explained by our Supreme Court:

> We have long endorsed a rule that "specific grounds not raised before the trial court, but raised for the first time on appeal will not support a favorable ruling on appeal." When a trial court never has the opportunity to rule on a legal question presented to an appellate court, an appellant presents a different case to the appellate court than the one decided by the trial court. Indeed, an appellate court is "without authority to review issues not raised in or decided by the trial court." The proper role for an appellate court is to review for error—and there can be no error when the issue has not been presented to the trial court for decision.

*Norton Healthcare, Inc. v. Deng*, 487 S.W.3d 846, 852 (Ky. 2016). In this case, the record is clear that the trial court actually considered the issue of an inadequate plan as part of the proceedings below. In fact, in its initial order in denying the Cabinet's motion to terminate Father's parental rights, the trial court relied on the fact that Father "was not provided a proper case plan after the ICPC process was started." R. at 64. Since this issue was considered at the trial court level, we are well within our judicial prerogative to consider it as part of this appeal.

provided a proper case plan after the ICPC process was started," R. at 64, as well as in the court's statements from the bench following the hearing on June 22, 2015. A thorough review of the record on appeal shows a case plan for Mother, and *requests* from Father to work a case plan, but is devoid of any reference of Father actually *receiving* a case plan. As noted above, testimony from witnesses for both parties at the June 22, 2015, hearing indicated that the Ms. Barker told Father certain steps he could take—to drug screen when ordered, to cooperate with the ICPC process, and to complete and follow the recommendations of a substance abuse assessment. The record indicates that Father did drug screen when ordered, which was the one time following the DNA hearing on November 20, 2013, and that he participated in ICPC process—although, granted, Ohio officials did not find his cooperation to be stellar. While Father admits he did not complete a substance abuse assessment, we do not believe that his failure to do so can be held against him where the directive was not part of a *written, court-approved case plan. See* KRS 600.020(1)(a)(9) ("Fails to make sufficient progress toward identified goals as set forth in *the court-approved case plan* to allow for the safe return of the child to the parent that results in the child remaining committed to the cabinet and remaining in foster care for fifteen (15) of the most recent twenty-two (22) months")(emphasis added).

Father twice requested to set up a case plan and the Cabinet twice failed to give him one to work. When the ICPC assessment was returned, denying *placement* of Child with Father, the Cabinet did not attempt to contact Father to work any sort of plan. The fact that Father's home and situation was not appropriate for temporary placement is not tantamount to a finding that Father would never be able to adequately parent Child. While there are certainly valid concerns as to whether Father can be a proper parent to Child, we cannot agree that Father's action in this case demonstrates that he intended to abandon child and was unwilling to work with the Cabinet toward reunification.

Additionally, as there was no court-approved case plan, the court's best interest analysis cannot stand. The analysis was "[b]ased on the length of time that the child has been in foster care, and the Father's inability to make progress on even his basic case plan," which led the court to believe that Father "[would not] be able to make sufficient progress to regain custody of the [C]hild." R. at 105. It was impossible for Father to make progress on a case plan that did not exist.

Our court system holds parental relationships in the highest esteem, and has found them deserving of the highest protection. Our nation's highest court has held that "the rights to conceive and to raise one's children [are] 'essential,' 'basic civil rights of man,' and '[r]ights far more precious ... than property rights.'" *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (internal citations omitted). Accordingly, "the integrity of the family unit has found protection in the Due Process Clause ... the Equal Protection Clause ... and the Ninth Amendment." *Id.* In Kentucky, our appellate courts have reiterated the special protections afforded to parental rights under the law. *See Cabinet for Health and Family Servs. v. A.G.G.*, 190 S.W.3d 338, 342 (Ky. 2006) ("Parental rights are so fundamentally esteemed under our system that they are accorded Due Process protection under the Fourteenth Amendment of the United States Constitution."). Specifically referring to the involuntary termination of parental rights, a panel of this court has stated that "[t]ermination can be analo-

gized as capital punishment of the family unit because it is so 'severe and irreversible.' " *R.P., Jr. v. T.A.C.*, 469 S.W.3d 425, 427 (Ky. App. 2015) (citing *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). "Utmost caution" was not exercised in this case before Father's parental rights over Child were terminated. The Cabinet's failures denied Father an opportunity to maintain contact with Child and to work toward a court-approved case plan to regain custody. "It may well be that [Father] will never be able to function as a good father, and thus his rights to his child[ ] may be terminated. Yet every attempt should be made to reunite an already fragmented and broken family." *Waters v. Cabinet for Human Res.*, 736 S.W.2d 365, 370 (Ky. App. 1987). Regrettably, here, Father was taken through the motions, without ever being afforded any meaningful opportunity to parent Child after the Cabinet stepped in. Therefore, we must reverse the order terminating his parental rights.

There is no winner in this case. The outcome is not a happy one for anyone involved. However, we cannot sanction the process that occurred in this case. While it is unclear where the breakdown occurred, it should not be repeated. As the trial court observed, the Cabinet has previously been criticized for making parenting plans too complicated. This case presents the other extreme. The oral plan given to Father is so lacking in formality and detail that it cannot constitute a plan, and therefore, we cannot conclude that Father was subjected to a fair process in this case. The facts presented show a breakdown in communication and a fragmented process; they do not evince abandonment by Father.

## IV.  CONCLUSION

Based on the foregoing, we reverse the Opinion of the Fayette Circuit Court.

JOHNSON, JUDGE, CONCURS.

THOMPSON, JUDGE, CONCURS IN RESULT ONLY.