RENDERED: NOVEMBER 1, 2018
TO BE PUBLISHED

$\mathfrak{Supreme\ Court\ of\ Kentucky}$

2018-SC-000011-DGE

SALLY A. MAY                                                    APPELLANT

ON REVIEW FROM COURT OF APPEALS
V.                    CASE NO. 2016-CA-001476-ME
JESSAMINE CIRCUIT COURT NO. 05-CI-00972

DONNIE J. HARRISON                                              APPELLEE

**OPINION OF THE COURT BY JUSTICE CUNNINGHAM**

**AFFIRMING**

Appellant, Sally A. May ("Ms. May"), and Appellee, Donnie J. Harrison

("Mr. Harrison"), never married but had two sons, now 15-year-old Elliot and

now 13-year-old Zane.[1] The boys resided with both parents until August 2005.

Thereafter, Elliot and Zane resided with Ms. May in Plain City, Ohio. During

this time, Ms. May married Joseph Yruegas and gave birth to two daughters.

Sometime thereafter, Ohio Child Protective Services removed Ms. May and all of

the children from the home due to Yruegas' drug addiction. Ms. May divorced

Yruegas and was awarded full custody of their daughters. In 2010, Mr.

---

[1] Pseudonyms are being used to protect the anonymity of all the child victims.

Harrison gained physical custody of the boys and brought them to Nicholasville, Kentucky.

When Ms. May subsequently pursued timesharing with Elliot and Zane, Mr. Harrison moved to suspend her visitation/timesharing rights based upon allegations from the two boys that Yruegas had sexually abused them. Elliot and Zane also alleged that Ms. May was involved in the sexual abuse. The Ohio police investigated but perceived no grounds for charges against Ms. May.

Being unable to resolve the evidentiary conflict which included Ms. May's denial of any sexual abuse of her boys, the trial court decided to conduct an in camera interview in chambers with then-13-year-old Elliot. The interview lasted over forty minutes during which Ms. May and her counsel were able to view the exchange through closed circuit video. The trial court subsequently ordered "that there be no contact between [Ms. May] and the two boys until either of their qualified mental health professionals believe it would be appropriate . . . ." In affirming the trial court, the Court of Appeals held that although the judge's questioning exceeded the bounds of KRS 403.290(1), the error was harmless. We granted discretionary review.

## Analysis

KRS 403.290(1) authorizes trial judges to conduct an in camera interview with children for purposes of custody and visitation determinations. It specifically provides as follows:

> The court may interview the child in chambers to ascertain the child's wishes as to his custodian and as to visitation. The court may permit counsel to be present at the interview. The court shall

2

cause a record of the interview to be made and to be part of the
record in the case.

When determining custodial issues, courts must consider the best interest of
the child. KRS 403.270. We review custody, visitation, and timesharing
determinations for an abuse of discretion. *Pennington v. Marcum*, 266 S.W.3d.
759 (Ky. 2008).

In the present case, the court appropriately sought to ascertain Elliot's
wishes concerning visitation. The court also engaged in an extensive fact-
finding mission as to the sexual abuse allegations. After asking Elliot why he
thought they were talking, he responded that he was there to assure the judge
that he would never have to visit his mother again. He was then asked
whether Ms. May engaged in sexual activity with him. Elliot reported that she
raped him in their basement in Plain City when he was around five or six years
old. He specifically stated that "she made me stick my penis into her area."
The judge clarified that "area" meant "female parts." Elliot also discussed other
instances where he and his brother Zane were sexually abused by Joseph
Yruegas while Ms. May watched.

Ms. May argues that the court's in camera questioning exceeded the
bounds of KRS 403.290(1), which she claims is limited to discerning a child's
wishes as to custody or visitation. We disagree.

There is no heavier responsibility for a trial judge than the interest of
children. Child custody decisions are a huge part of this awesome burden.
KRS 403.270 gives the judge direction to make these critical determinations for
the best interest of the child. That statute enumerates several broad and

3

encompassing factors to be considered in that decision making. KRS 403.270(2). This gives the judge wide fact-finding responsibility. Inherent with that statutory mandate is the authorization to seek out testimony from the child involved, as need be.

It is counterintuitive to think that a judge can interview a child for the much less important question of where the child wants to live and not be able to ask the child about serious allegations of sexual abuse. An obvious corollary to a child's wishes concerning visitation or custody is *why* the child harbors such wishes. Moreover, the Court of Appeals correctly noted that our rules of evidence place the court in control of evidence and permit the court to interrogate witnesses. KRE 611, 614. These rules cannot be superseded by statute. Therefore, it is appropriate for the court to make detailed inquires especially when allegations of sexual abuse are at issue.

Ms. May also alleges that her right to due process and her right to cross-examine Elliot were violated here. However, she concedes that the judge returned to the courtroom during the in camera interview and permitted her counsel to submit questions for Elliot on two separate occasions. Therefore, Ms. May was permitted an opportunity to question the witness. *See also, Cabinet for Health and Family Services v. A.G.G.*, 190 S.W.3d 338, 344-45 (Ky. 2006) (holding that confrontation clause does not apply in civil cases). Considering the unique context of domestic relation cases and the in camera testimony of minors, Ms. May received the process that is due.

4

Due to the seriousness of the allegations and the persuasiveness of Elliot's testimony, we cannot say the trial court abused its discretion by suspending Ms. May's visitation rights.

## Conclusion

We hereby affirm the Court of Appeals' decision.

All sitting. Minton, C.J.; Hughes, VanMeter, and Wright, JJ., concur. Keller, J., concurs in result only by separate opinion in which Venters, J., joins.

KELLER, J., CONCURRING IN RESULT ONLY: I must respectfully concur in result only with the majority opinion. Although I agree with the majority's holding as to the *in camera* interview of Elliott[2], I believe further development of the facts and issues is warranted.

Sally May, f/k/a Sally Yruegas, ("Sally") initiated this case in 2005 in Jessamine County Family Court, seeking child support for her two minor children, Elliott (b. 2003) and Zane (b. 2004).[3] Donnie J. Harrison ("Donnie") admitted paternity in 2006 to both boys. An order of support was entered in August 2006. For several years, Elliott and Zane lived with Sally and the only issues before the court involved support payment. However, in August 2010, Donnie filed a motion to stop child support, stating that the children were now

---

[2] In accordance with this Court's practice, and to protect the minor children's anonymity, I shall refer to the minor children by pseudonyms. For clarity, I shall utilize any pseudonyms referenced in the majority opinion.

[3] *See* footnote 1.

living with him. The exact timeline is unknown, but somewhere from 2006-2010, Sally married Joseph Yruegas and had two more children, Maizie (b. 2008) and Penelope (b. 2009).[4] In June 2011, the court's docket sheet noted that mother was to have timesharing with the boys one weekend each month, along with a few other specific periods and holidays.

On June 1, 2016, Sally's attorney filed a motion to hold Donnie in contempt for interfering with Sally's timesharing with the boys. On July 27, 2016, Donnie filed a renewed motion to suspend visitation, or in the alternative, to modify visitation. As grounds, Donnie stated that there was a criminal investigation concerning incest and sexual abuse perpetrated on the children by Sally and Yruegas. Both these motions were brought to the court in a hearing held on August 1, 2016 that continued, and concluded, on August 24, 2016.

At the hearing, more of the timeline was developed. Sally testified that she was living in Ohio with Yruegas, Elliott, Zane, Maizie, and Penelope. Sometime in 2010, Elliott and Zane moved to Kentucky with Donnie, presumably upon Donnie's motion. Ohio family services became involved in Sally and Yruegas's home due to Yruegas's drug addiction, according to Sally. Ohio removed Maizie and Penelope from the home in July 2013. Sally separated from Yruegas in August 2013 and their divorce became final in March 2014.

---

[4] *See* footnote 1.

6

Sally testified that, in July 2013, Elliott and Zane alleged that Yruegas and Sally had sexually abused both of them. At the hearing, she denied ever being involved in any abuse and stated she had no firsthand knowledge of any abuse by Yruegas. Sharon Cecil, a social worker with the Cabinet for Health and Family Services ("CHFS") in Kentucky, testified that they had substantiated sexual abuse by mom in 2013. Sally was living out of state at the time so they referred the case to Ohio for one of their corollary CHFS workers to speak to Sally. Kentucky CHFS recommendations included no contact with Sally. The case was also reported to law enforcement in Ohio.[5] However, it is undisputed by all parties that Sally continued to have visitation with the children as ordered and the no contact recommendation was never brought before the court or utilized by Donnie to stop Sally from seeing Elliott or Zane.

Bethany Outland, a social services clinician, also testified. Elliott had disclosed the sexual abuse to her in 2013; she referred the case to Ohio and arranged an interview for both Elliott and Zane with the Children's Advocacy Center ("CAC"). Elliott was also referred for medical evaluation because he reported penetration as part of the abuse; Outland also testified to Donnie's difficulty with the children because they had been perpetrating against each

---

[5] It is unclear from the record why there was no subsequent prosecution against Sally or if there ever was a prosecution against Yruegas. The attorneys referenced some discussions with Ohio law enforcement, stating that Sally had claimed duress and was forced to abuse the boys by Yruegas. The GAL concurred in these statements but there was no substantive proof offered as to these allegations. Thus, there was no actual evidence in the record as to what happened to these potential prosecutions.

other and acting out. Kristen Jenkins conducted the forensic interviews of both Elliott and Zane at the CAC. She testified that she was not concerned about coaching or any "alternative hypothesis" for the disclosures made by the boys.

At issue for the attorneys was whether the family court judge could review the CAC interview videos as evidence for the motion to suspend timesharing. If he ruled the videos were inadmissible, then the guardian ad litem ("GAL") for Elliott and Zane stated that Elliott wished to testify. The court ruled the videos were inadmissible and told the attorneys he would speak to Elliott *in camera* and would take a break to ask if the attorneys had any questions for Elliott. At the time of the hearing, Elliott was 13 years old. Importantly, none of the attorneys objected to Elliott being interviewed *in camera* by the judge.

The judge's interview of Elliott was broadcast to the parties in the courtroom while it occurred *in camera*. The judge did not place Elliott under oath but did spend some time explaining the difference between truth and lies and how important it was to tell the truth. The judge also indicated it was acceptable for Elliott to explain if he could not remember the answer to a question. Elliott gave a lengthy testimony about his experiences, describing acts of sexual abuse by both Sally and Yruegas and being forced to engage in abuse along with his brother. Elliott unequivocally stated that he did not want to talk to or see his mom at all. When prompted why, Elliott explained the abuse to both him and Zane. The details of this abuse are not germane to this

appeal but suffice to say that, although some details were inconsistent, Elliott's explanation of abuse was detailed and thorough. Elliott explained that he disclosed the abuse to Donnie after he and Zane moved to Kentucky. Zane did not appear or speak to the court as he was currently housed in a residential facility for treatment.[6]

After Elliott's *in camera* interview, attorneys made arguments to the court on both the contempt and timesharing suspension issues. The judge ordered timesharing suspended, not permanently, but until such time as Elliott's and Zane's individual counselors deemed it advisable for therapeutic contact with Sally to begin. The judge also determined Donnie had committed contempt by interfering with Sally's visitation and would determine appropriate costs and sanction after Sally's attorney submitted an affidavit as to fees. The judge stated he would draft a final order and circulate it to the parties. I must point out that Donnie had failed to ever bring the sexual abuse allegations to the court's attention *until* Sally made the motion for contempt and sanction. Elliott and Zane had continued to see Sally for over three years after the CAC interviews in which they alleged abuse. It is also unclear from the record before this Court why CHFS never filed a petition for dependency, neglect, or abuse against Donnie, who was within Kentucky CHFS jurisdiction, for

---

[6] From the testimony at the hearing and earlier affidavits from the parties in the record, it seems that Zane had begun exhibiting serious signs of trauma and acting out against his sibling and family. According to counsel, he was involved in a criminal case with the Department of Juvenile Justice ("DJJ") and had been ordered to undergo a competency evaluation. After the evaluation, he was referred to a facility for long-term treatment.

9

allowing the contact with Sally to continue, despite the no contact recommendation.

The *in camera* interview here was not an abuse of discretion, as the majority so holds. Kentucky Revised Statute (KRS) 403.290(1) specifically provides that "[t]he court may interview the child in chambers to ascertain the child's wishes as to his custodian and as to visitation." Sally now claims several errors in the *in camera* interview, despite raising no objection before, during, or after the interview itself. She claims that the interview exceeded the permissible statutory scope; the interview violated Sally's due process rights to cross-examine the witness and challenge the testimony; and the judge impermissibly utilized the interview to elicit unsworn testimony and gather evidence.

The statute allowing *in camera* interviews is highly discretionary and our precedent evinces the great latitude we provide to trial court judges in utilizing the statute. "The General Assembly wisely left the decision to interview a child in chambers to the sound discretion of the trial court." *Addison v. Addison,* 463 S.W.3d 755, 764 (Ky. 2015). "The elementary principles of humanitarianism are so strongly against the placing of a child between its parents that we feel a trial court should have a wide latitude in protecting the child." *Id.* (quoting *Parker v. Parker,* 467 S.W.2d 595, 597 (Ky. 1971)). As in many matters, a family court judge is vested with great discretion in conducting these kinds of proceedings. *See Seeger v. Lanham,* 542 S.W.3d 286, 297 (Ky. 2018) (quoting *Commonwealth ex rel. Marshall v. Marshall,* 15

10

S.W.3d 396, 400 (Ky. App. 2000)) ("There are few matters over which the trial court has more discretion than cases involving domestic relations issues."). We continue to respect that discretion and trust the family courts to conduct these proceedings in a careful and cautious approach.

The crux of Sally's argument is that the scope of the *in camera* interview is statutorily limited to "ascertain the child's wishes as to his custodian and as to visitation." KRS 403.290(1). However, Sally's interpretation, limiting the questioning to this desire alone rather than substantiated reasoning for any such desire, defeats the purpose of the statute. How can a judge make a meaningful decision as to custody and visitation if he or she is denied the opportunity to explore the *reasons* for the child's wishes? Here, Elliott clearly wanted to discontinue any contact with Sally. It was incumbent upon the judge to understand *why* he felt that way in order to determine, per the directives of KRS 403.320(3), whether Elliott's health or welfare was endangered by continued visitation with Sally.[7] Our courts have clearly stated that "a presumption for visitation exists for a parent unless a family court determines that visitation would seriously endanger the child." *Baldwin v. Mollette*, 527 S.W.3d 830, 834 (Ky. App. 2017). The burden of overcoming that presumption is on the party wishing to deny visitation. *Id.* (citing *Smith v. Smith*, 869 S.W.2d 55, 56 (Ky. App. 1994)). The GAL here, in representing

---

[7] "The court may modify an order granting or denying visitation rights whenever modification would serve the best interests of the child; but the court shall not restrict a parent's visitation rights unless it finds that the visitation would endanger seriously the child's physical, mental, moral, or emotional health." KRS 403.320(3).

11

Elliott's interests, opposed visitation with Sally. Elliott expressed those wishes to the judge through the *in camera* interview. If the judge was restricted in exploring that desire and any permissible reasoning for that desire, then that party would be essentially estopped from presenting the very proof case law requires. Such a decision would eviscerate the meaning of imbuing these courts with discretion to make such important decisions and the permission granted by the General Assembly to conduct such *in camera* interviews.

Sally emphasizes an unreported case from the Court of Appeals, *Karnes v. Head*, No. 2011-CA-002054-ME, 2012 WL 5042710 (Ky. App. Oct. 19, 2012). In that case, the family court referenced an *in camera* interview of the child and determined that bruises on the child were caused by the mother's paramour. *Id.* at *2. The Court of Appeals specifically stated, however, that "[t]he best interest of the child may be different in each case; therefore, that determination is left within the sound discretion of the family court." *Id.* (citing *Pennington v. Marcum*, 266 S.W.3d 759, 769-70 (Ky. 2008)). The child here stated in the interview that the paramour had punched him several times and those statements "supported the trial court's decision." *Id.* Given this support, "there was no clear error or abuse of discretion." *Id.* Judge Caperton dissented and stated that the child's testimony "should have been excluded on all issues other than [the child's] desires and wishes as to custody and visitation." *Id.* at *7. Judge Caperton stated that "while it may be in the discretion of the court to control the mode of cross-examination, there must be procedures available to the parties whereby they can review the evidence considered by the court

12

and present rebuttal evidence which will assure that the demands of due process are met." *Id.*

The Court of Appeals determined, as we determine in this case, that the *in camera* interview appropriately delved into the underlying issues of abuse. If the court cannot determine the validity of these underlying allegations from the child's testimony, then the court would be obstructed from making a meaningful determination as to custody or visitation. It is imperative that the court be permitted, within its discretion, to determine whether the child's wishes are sound, based upon fact, and persuasive as to its decision on custody or visitation. But, as the dissent noted, I believe there *can* be due process concerns. However, those concerns are not present here.

Sally's arguments that she had no opportunity to cross-examine or rebut testimony are illusory. It is true that if the trial court conducts an *in camera* interview, "a record of such interview must be made so that the parties are afforded the subsequent opportunity to determine and contradict the accuracy of statements and facts given during the interview." *Couch v. Couch,* 146 S.W.3d 923, 925-26 (Ky.2004). However, Sally was given an opportunity to present questions for Elliott to the judge. She also raised no objection to such a manner of cross-examination. A "party [does have a] due process right to confront the evidence against him or her." *Morgan v. Getter,* 441 S.W.3d 94, 111 (Ky. 2014). However, unlike in *Couch,* Sally and her attorney were watching the entire interview with Elliott as it occurred. The judge paused on two occasions to ask if the parties had any questions for him to ask Elliott

13

during the interview. Sally did not object to this manner of cross-examination at the time of the hearing. It was only after the court's decision, adverse to her wishes, that she raised the issue in her appeal.

Additionally, the judge gave all parties an opportunity to present further witnesses after Elliott's interview and all parties declined. Sally had a meaningful opportunity to respond to Elliott's interview; simply because she chose not to utilize that opportunity does not mean her due process rights were violated. The manner in which the judge conducted this interview seems to be perfectly in accord with the intent of the legislature in crafting the statute. The General Assembly specifically stated that "[t]he court *may* permit counsel to be present at the interview." KRS 403.290(1) (emphasis added). The court did not permit counsel to be present in the confines of the room for the interview, as seems to be permitted by the statute, yet still protected the due process rights of the parties to submit questions for the child. As stated in *Couch*, due process requires that "[t]he parties are entitled to know what evidence is used or relied upon by the trial court, and have the right generally to present rebutting evidence or to cross-examine, unless such right is waived." *Couch*, 146 S.W.3d at 925. Sally knew the evidence against her; she was given an opportunity to question and rebut that evidence. Her due process rights remained unviolated.

For the foregoing reasons, I concur in the result of the majority opinion.

14

I believe the proper result was reached and affirming both the trial court and Court of Appeals is appropriate.

Venters, J., joins.


COUNSEL FOR APPELLANT:

Michael Robey
COOLEY IULIANO ROBEY, PLLC


APPELLEE:

Donnie J. Harrison